**Christine Wells GROFF and Michael Wells, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 05–1049C.**

United States Court of Federal Claims.

July 27, 2006.

Act of 1976, 42 U.S.C. §§ 3796–3796d–7 (2000 & Supp. III 2003, as amended) (PSOBA) for the survivors of Mr. Lawrence Groff. The motions have been fully briefed, and oral argument was heard on June 1, 2006. Plaintiffs' motion, for the reasons discussed below, is granted.

## BACKGROUND[1]

Plaintiffs request compensation under PSOBA for the death of Mr. Lawrence Groff, the husband of Mrs. Christine Wells Groff and the step-father of Michael Wells. From April 7, 1997 through August 27, 2001, Mr. Groff was employed by San Joaquin Helicopters (SJH), a California corporation, which provides pilots to the California Department of Forestry and Fire Protection (CDF). On August 27, 2001, Mr. Groff was piloting an aerial firefighting tanker, helping to suppress a wildfire near Hopland, California. Although Mr. Groff was employed by SJH, the airtanker he was piloting was owned by the CDF. Tragically, Mr. Groff's airtanker collided with another aircraft in mid-air, and he died as a result of the collision.

On August 21, 2002, Mrs. Groff applied for PSOBA survivors' benefits for herself and her son. Administrative Record (AR) at 3–4. On October 31, 2002, the BJA denied plaintiffs' claim, finding that Mr. Groff "was not functioning as a public safety officer as defined by the PSOB Act and set forth in the PSOB regulations" at the time of his death, and that his survivors were thus not entitled to benefits under the statute. *Id.* at 134. Mrs. Groff appealed that ruling, arguing, it appears from the record, that her husband "was, in fact, serving a public agency [the CDF] in an official capacity as a fire fighter." *Id.* at 188. The denial of PSOBA benefits was sustained by the hearing officer on February 20, 2004. *Id.* at 191.

On February 9, 2005, Mrs. Groff appealed the hearing officer's decision to the Director of the BJA. She argued that she and her son "should receive benefits under the PSOBA because the Act does not require that her late husband be directly employed by a public agency." *Id.* at 152. The BJA Director

Daniel Q. Poretti, Minneapolis, MN, for plaintiffs. Steven M. Sitek, Minneapolis, MN, of counsel.

Timothy P. McIlmail, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Victoria O'Brien, Office of General Counsel, Office of Justice Programs, United States Department of Justice, Washington, DC, of counsel.

## OPINION

BUSH, Judge.

The court has before it the parties' cross-motions for judgment on the administrative record. Plaintiffs contest the denial by the Bureau of Justice Assistance of the United States Department of Justice (BJA) of benefits under the Public Safety Officers' Benefits

1. The facts recited here are undisputed, unless otherwise indicated.

affirmed the hearing officer's decision that Mrs. Groff and her son were ineligible for PSOBA benefits. *Id.* at 905. On September 29, 2005, plaintiffs filed suit in this court to challenge the final agency determination by the BJA denying PSOBA benefits.

## DISCUSSION

### I. Jurisdiction

Plaintiffs assert jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2000), and the money-mandating provisions of PSOBA. Plaintiffs state that they have exhausted all administrative remedies. Defendant does not dispute jurisdiction. A final decision of the BJA Director denying PSOBA benefits is subject to review in this court. *Demutiis v. United States,* 291 F.3d 1373, 1376 (Fed.Cir. 2002).

### II. Standard of Review for a Motion for Judgment on the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.[2] To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed.Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

Subsequent to the final decision of the BJA Director,

[j]udicial review of a BJA denial of death benefits under [PSOBA] is limited to three inquiries: "(1) whether there has been substantial compliance with statutory [sic] and implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the Government officials involved; and (3) whether there was

substantial evidence supporting the decision."

*Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995) (quoting *Morrow v. United States,* 227 Ct.Cl. 290, 647 F.2d 1099, 1102 (1981)).

### III. Analysis

#### A. PSOBA Benefits

PSOBA provides, *inter alia,* a one-time cash payment[3] to the survivors of public safety officers who die "in the line of duty":

In any case in which the Bureau of Justice Assistance ... determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit of $250,000, adjusted in accordance with subsection (h) of this section....

42 U.S.C. § 3796(a). The definition of public agencies, whose public safety officers qualify for a death benefit if an officer is killed in the line of duty, is provided by the statute:

"[P]ublic agency" means the United States, any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States, or any unit of local government, department, agency, or instrumentality of any of the foregoing....

42 U.S.C. § 3796b(8) (formerly codified at 42 U.S.C. § 3796b(7)). A public safety officer is defined by PSOBA, in relevant part, to be

an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, as a chaplain, or as a member of a rescue squad or ambulance crew....

42 U.S.C. § 3796b(9)(A) (formerly codified at 42 U.S.C. § 3796b(8)(A)). The question

---

**2.** This rule was recently rewritten and renumbered. The parties briefed their motions pursuant to the old rule, RCFC 56.1. The standard of review for motions on the administrative record remains unchanged.

**3.** The award amount of $250,000 is corrected upward for inflation each year. 42 U.S.C. § 3796(h)-(i).

raised by the cross-motions before the court is whether Mr. Groff was a public safety officer, as defined by PSOBA, at the time of his death.

## B. Serving a Public Agency in an Official Capacity Further Defined

The language "serving a public agency in an official capacity" is not defined in PSOBA or in PSOBA's implementing regulations. *See Chacon,* 48 F.3d at 511 ("The Act does not, however, define what it means to 'serv[e] in an official capacity.'").[4] Nonetheless, the United States Department of Justice has had occasion to interpret this language over the years, and has memorialized these interpretations in a policy letter compiling its rulings in various cases. *See* Department of Justice, Office of Justice Programs, Public Safety Officers' Benefits Program, 70 Fed.Reg. 43078, 43080 (proposed rules of July 26, 2005, to be codified at 28 C.F.R. Part 32) (describing the BJA policy letter as based, at least in part, "on the considerable and broad-ranging experience and expertise BJA has derived from innumerable claims"). The BJA's "internal agency policy, practice, and guidance ... have come increasingly to inform the agency's decision-making, gradually taking on significant authority." *Id.* Thus, "since November 1981, the [BJA policy letter], Le-

gal Interpretations of the Public Safety Officers' Benefits Act, has been a guiding authority for BJA, program hearing officers, [Office of Justice Programs], and the judiciary." *Id.*

In particular, the 1981 BJA policy letter provides a two-sentence definition of serving a public agency in an official capacity:

> In order to be serving a public agency in an official capacity one must be an officer, employee, volunteer, or [in a] similar relationship of performing services as a part of a public agency. To have such a relationship with a public agency, an individual must be officially recognized or designated as functionally within or a part of the public agency.

AR at 138. This gloss on the statutory language of PSOBA has been described as a "regulatory definition" entitled to *Chevron* deference by the United States Court of Appeals for the Federal Circuit. *Chacon,* 48 F.3d at 512 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).[5] The Federal Circuit found "nothing unreasonable" in this BJA statement establishing the criteria for individuals who fit within the public safety officer definition in PSOBA. *Id.* It is against this BJA interpre-

---

4. In 2005, the BJA proposed extensive revisions of PSOBA regulations, including for the first time a definition of serving a public agency in an official capacity. Department of Justice, Office of Justice Programs, Public Safety Officers' Benefits Program, 70 Fed.Reg. 43078 (proposed July 26, 2005) (to be codified at 28 C.F.R. Part 32). This notice explains that "[s]ome confusion has arisen over the years as to whether employees or volunteers who serve independent contractors or non-public entities that are working for public agencies are 'serving a public agency in an official capacity' or are 'employees' within the meaning of the PSOB Act, or whether those independent contractors or non-public entities are 'instrumentalities' of public agencies within the meaning of the Act." *Id.* at 43081. The notice also states that "[i]n an effort to assist claimants, pursuant to 42 U.S.C. [§ ] 3796(a) and (b), and [§ ] 3796c(a), the proposed rule sets out key definitions to clarify these terms within the four corners of the regulation." *Id.*

5. *Chacon* was decided in 1995, before the United States Supreme Court decisions in *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), and *United States v. Mead*

*Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), clarified the circumstances in which *Chevron* deference should be given to the administrative implementation of a statute. *See Barnhart v. Walton,* 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (explaining that *Chevron* deference is governed by the rule provided in *Christensen,* as further refined by *Mead).* Although the Federal Circuit might not today accord *Chevron* deference to the BJA policy letter's two-sentence interpretation of "serving a public agency in an official capacity" under the *Mead* standard, this court is bound by precedent of the Federal Circuit unless that precedent is expressly overruled by a subsequent Supreme Court decision. *See Strickland v. United States,* 423 F.3d 1335, 1338 n. 3 (Fed.Cir.2005) (stating the exceptions which allow the Court of Federal Claims to depart from the binding precedent of the Federal Circuit) (citing *Bankers Trust N.Y. Corp. v. United States,* 225 F.3d 1368, 1372 (Fed. Cir.2000)). Because *Mead* does not compel a different level of deference for the quoted two sentences of the 1981 BJA policy letter than that given by the *Chacon* court, this court must give that interpretation the same level of deference as it was given in *Chacon.*

tation of "serving a public agency in an official capacity" that Mr. Groff's performance of services for the CDF must be measured.

## C. Was Mr. Groff Performing Services as an Officially Recognized Part of a Public Agency?

Plaintiffs argue that Mr. Groff was a part of the CDF and that he fell within the BJA interpretation of the PSOBA definition of a public safety officer. Pls.' Mot. at 2. Plaintiffs assert that "[t]here is little or no dispute regarding the overwhelming evidence which demonstrates Mr. Groff was officially recognized and functionally within or a part of the CDF when he died in the line of duty." *Id.* To succeed in their suit, plaintiffs must show that Mr. Groff was performing services as a part of the CDF much like an employee, and that Mr. Groff was officially recognized by the CDF as being functionally within or a part of the CDF.

### 1. Mr. Groff Was Not a CDF Employee

As an initial matter, it is clear from the evidence and arguments of the parties that Mr. Groff was an employee of San Joaquin Helicopters (SJH). The agreement between SJH and the CDF explicitly sets forth the status of SJH employees:

> The Contractor [SJH], and the agents and employees of the Contractor, in the performance of the agreement, shall act in an independent capacity and not as officers or employees or agents of the State of California.

AR at 799. Mr. Groff was hired by SJH in 1997 and was an SJH employee when he died on August 27, 2001. AR at 719, 762; Def.'s Facts ¶ 8; Pls.' Mot. at 1 (acknowledging "Mr. Groff's private employment via a contract with the CDF").

Plaintiffs present, as an alternative argument, that Mr. Groff should be deemed a CDF employee because of the level of control exercised over Mr. Groff by the CDF. Pls.' Mot. at 12. The court agrees with plaintiffs that the BJA interpretation of "serving a public agency in an official capacity" is broader than "a test of employment or to establish vicarious liability," *id.* at 6, and that

a test of employment status is not the most relevant inquiry here, *id.* at 25. The court notes, however, that being an employee of a public agency, and being in a similar relationship of performing services as a part of a public agency, are two separate and alternative categories which fall within the BJA interpretation of "serving a public agency in an official capacity." Therefore, in the interest of thoroughness, the court examines plaintiffs' argument that Mr. Groff was, "in fact and in law," a CDF employee. *Id.* at 12.

Plaintiffs cite five court decisions that discuss control of an employer over a person and how control may be used as a factor in determining whether that person is an employee. Pls.' Mot. at 21, 25. In the first case cited by plaintiffs, the Supreme Court ruled that control may be a factor in determining whether a partner of a professional corporation is also an employee for Americans with Disabilities Act of 1990(ADA) purposes. *Clackamas Gastroenterology Assocs., P.C. v. Wells,* 538 U.S. 440, 449, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003). However, Mr. Groff's situation as an employee of a contractor working for a public agency is not analogous to that of a shareholder doctor in a medical clinic, and *Clackamas* sheds no light on Mr. Groff's employment status.

Plaintiffs also cite a number of "independent contractor" cases. The Supreme Court has said, in one cited example, that a court must " 'consider the hiring party's right to control the manner and means by which the product is accomplished' " to determine who is an employee for Employee Retirement Income Security Act of 1974 (ERISA) purposes. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting *Cmty. For Creative Non–Violence v. Reid,* 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). However, Darden was an insurance agent for a large insurance company, not an employee of a contractor engaged by a government agency, and as a consequence *Darden* provides no guidance as to Mr. Groff's employment status.

The Supreme Court ruled, in another case cited by plaintiffs, that the nature of a person's working environment, for example

whether that person's role is integrated into a production line, is a factor in deciding whether that person is an employee or an independent contractor for Fair Labor Standards Act of 1938 (FLSA) purposes. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 726–30, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). But the Court also noted in *McComb* that in different circumstances, "[t]here may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees." *Id.* at 729, 67 S.Ct. 1473 (citations omitted). In *McComb* the meat deboners divided among themselves a piecework fee from the company. *Id.* at 725, 67 S.Ct. 1473. SJH operated differently, offering Mr. Groff wages, benefits and the other indicia of employment. Thus, *McComb* is not on point, either.

In another "independent contractor" case cited by plaintiffs, the Supreme Court of California found that certain agricultural workers were not independent contractors for workers' compensation coverage purposes, despite signing an agreement that labeled them as independent contractors. *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations,* 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399, 400 (1989). In this case, measuring the control by the grower of the agricultural operations was the principal test for determining whether these persons were the grower's employees. *Id.* at 404. There was, however, no contractor to broker the workers' services to the organization in need of them; the grower directly engaged the agricultural worker and his family to harvest cucumbers. *Id.* at 401. The court remarked that "courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." *Id.* at 404. Mr. Groff' s contract pilot employment with SJH is an example from that "infinite variety of service arrangements" which is not resolved by the "independent contractor" analysis of cucumber harvesters offered in *S.G. Borello*.

Finally, plaintiffs cite a case which has some surface similarities to Mr. Groff' s situation. The case involved a contract pilot, who hired both himself and his small plane to the United States Forest Service for thirty dollars an hour. *United States v. Becker,* 378 F.2d 319, 320 (9th Cir.1967). The issue on appeal was whether the trial court had erred in finding that the pilot was an employee of the United States within the meaning of the Federal Tort Claims Act (FTCA). *Id.* at 321. The Ninth Circuit noted that some evidence tended to indicate that the pilot was an independent contractor, and other evidence tended to indicate he was an employee. *Id.* at 321–22. The appeals court also commented that the facts of the case were "so unique [as to make precedent unhelpful]." *Id.* at 323. Under the "clearly erroneous" standard of review, the appellate panel stated that "we are not left with the definite and firm conviction that a mistake was committed by the trial court in making the ultimate finding that [the pilot] was serving as an employee of the United States at the time of the accident." *Id.*

In *Becker* there was no intervening corporation that had contracted with the Forest Service to provide pilots. This factual difference between *Becker* and the subject matter is not minor. SJH performed a not insubstantial function of limiting the CDF's liability in the case of airplane accidents. A provision of SJH's contract with the CDF stated that SJH would indemnify the CDF for any liability resulting from the actions of SJH's pilots, including any liability for injuries sustained by these pilots. AR at 799.

Even if *Becker* were perfectly analogous to this case, the Ninth Circuit has since criticized the employment status analysis in *Becker* because of intervening Supreme Court and Courts of Appeals precedent:

> [Plaintiff], however, fails to appreciate the extent to which *Becker* has been weakened by subsequent Supreme Court pronouncements. The Court has indicated that detailed regulations and inspections are no longer evidence of an employee relationship. In interpreting *Logue* and *Orleans,* our court has said that the ability to compel compliance with federal regulation does not change a contractor's personnel into federal employees. There must be substantial supervision over the day-to-day op-

erations of the contractor in order to find that the individual was acting as a government employee.

*Letnes v. United States*, 820 F.2d 1517, 1518–19 (9th Cir.1987) (citing the FTCA cases *United States v. Orleans*, 425 U.S. 807, 815, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Logue v. United States*, 412 U.S. 521, 529–30, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Ducey v. United States*, 713 F.2d 504, 516 (9th Cir. 1983); *Lurch v. United States*, 719 F.2d 333, 337 (10th Cir.1983)). The Ninth Circuit held that the decedent pilot Letnes, employed by a contractor engaged by the United States Forest Service, was not a Forest Service employee for FTCA purposes. *Letnes*, 820 F.2d at 1519. *Letnes* can be read to hold that evidence of required compliance with safety rules and regulations does not, by itself, show that agency control has transformed the contractor pilot into a public employee.[6]

At this point in the analysis, the court notes that none of the cases cited by plaintiffs, discussing an entity's control of a person who must then be deemed an employee of that entity, and none of the cases cited in *Letnes*, discussing the unimportance of evidence related to a contractor's compliance with safety rules and regulations in the determination of whether that person is an employee of a government agency, are concerned with the concept of "serving a public agency in an official capacity," as those terms are used in PSOBA. Instead, these cases inquire into a person's employee status for other purposes, to decide whether a person is an "employee," as that term is used in the ADA, ERISA, workers' compensation statutes, and the FTCA. When courts turn to common law measures of control to determine who is, and who is not, an employee, it is to elucidate a functional definition of "employee" in the context of a particular statutory scheme. *See, e.g., Darden*, 503 U.S. at 326, 112 S.Ct. 1344 (stating that "the textual asymmetry between [FLSA and ERISA] precludes reliance on FLSA cases when construing ERISA's concept of employee"); *Orleans*, 425 U.S. at 818, 96

S.Ct. 1971 (rejecting the suggestion that the Economic Opportunity Act and the FTCA create a scheme which "convert[s] the local executors of a locally planned program or project which receives conditional federal funding into federal employees"). No universal, common law test of control, defining employee status for all statutory schemes, emerges from the caselaw before the court.

The cases cited by plaintiffs and the FTCA cases cited in *Letnes* do not, therefore, provide a definition of "employee" that is determinative in the context of PSOBA awards. The court can discern no legal standard applicable in the PSOBA context by which the court could measure the CDF's control over Mr. Groff and then determine whether that control establishes that Mr. Groff worked for the CDF as a CDF employee. The caselaw cited by plaintiffs has not persuaded the court that Mr. Groff was a CDF employee for PSOBA purposes.

### 2. Are the Survivors of Contractor Employees Eligible to Receive PSOBA Benefits?

The real dispute in this case, then, is whether Mr. Groff, an SJH employee, was nonetheless performing services as a part of the CDF much like a CDF employee and was officially recognized by the CDF as doing so. The BJA concluded, when it applied the BJA's two-sentence interpretation of "serving a public agency in an official capacity," that a contractor employee such as Mr. Groff is not in a relationship to a public agency similar to the relationship of an employee of that public agency. *See* AR at 896 (Final Agency Determination) ("[T]he determinative issue in this claim is whether a privately-employed pilot rendering fire suppression assistance to a public agency under a contract with the public agency is covered by [PSOBA]."); *id.* at 901 ("BJA may not unilaterally extend the coverage of [PSOBA] to private sector workers."). The BJA has previously had occasion to apply the "similar relationship" and "official recognition" tests of its

---

**6.** *Letnes* does not, however, provide a strongly analogous situation to this case because *Letnes* involved a pilot flying a contractor-owned plane, 820 F.2d at 1517–18, whereas Mr. Groff piloted a CDF plane.

gloss on "serving a public agency in an official capacity" to the claim of the survivors of another contractor employee.

In 1980, the United States Department of Justice applied its interpretation of "serving a public agency in a official capacity" to the specific facts of a claim for PSOBA benefits by the survivors of a Mr. Holstine, who was working as a pilot. AR at 137–39. Like Mr. Groff, Mr. Holstine worked with the State of California fighting fires and died while firefighting. *Id.* at 137. Rejecting the Holstine claim, the Administrator's Final Decision held that Mr. Holstine did not fall within the BJA (then the Law Enforcement Assistance Administration) interpretation of employees who are "serving a public agency in an official capacity," because he was employed by a contractor, not by the State of California. *Id.* at 139.[7] Defendant asserts that the BJA's rejection of plaintiffs' claim here is consistent with the rejection in 1980 of the PSOBA claim related to Mr. Holstine's death. The court observes that these two agency decisions are consistent in their results, but notes that the agency decisions are distinguishable, both on their facts[8] and, more significantly, because of statutory amendments[9] that have occurred in the years separating the two claims.

In addition to the two-sentence gloss on "serving a public agency in a official capacity," where the Department of Justice identified the "similar relationship" and "official recognition" tests, the 1981 policy letter includes the rest of the case summary of the rejection of the Holstine claim, from which

those two sentences were extracted by the Federal Circuit in *Chacon,* 48 F.3d at 512; AR at 137–39. And while this court accords *Chevron* deference to that two-sentence definition of the statutory term,[10] the remainder of the reasoning expressed in the 1980 decision related to Mr. Holstine is naught but the BJA's unpublished interpretation, albeit a longstanding one, of the rights of the survivors of contractors under PSOBA. As such, the reasoning employed in the 1980 decision is entitled to *Skidmore* deference. *See Cathedral Candle Co. v. United States Int'l Trade Comm'n,* 400 F.3d 1352, 1370 (Fed. Cir.2005) (stating that courts "give *Skidmore* deference to unpublished agency interpretations of statutes"). The court must accord the BJA's position on contractors under PSOBA "the weight [proportional to] the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

■ The BJA reads PSOBA to deny that contractors perform services as a part of a public agency in a relationship similar to that of the agency's employees. AR at 891 (Final Agency Determination, quoting initial denial determination) (" 'The death of a privately-employed worker who has been contracted by a public agency is not covered by [PSOBA].' "). This reading derives from the BJA's analysis of the legislative intent of PSOBA.[11] AR at 138–39, 896 n. 14, 897;

---

7. That decision was upheld by the United States Court of Appeals for the Ninth Circuit in an unpublished, non-precedential two-page decision. *Holstine v. Dep't of Justice Law Enforcement Assistance Admin.,* No. 80–7477, slip op. (9th Cir. Aug.4, 1982), 688 F.2d 846 (table). The Ninth Circuit subsequently decided that it does not have jurisdiction over appeals of the denial of PSOBA benefits. *Davis v. United States,* 169 F.3d 1196, 1197 (9th Cir.1999) ("Accordingly, we now join other circuits in concluding that the courts of appeals lack jurisdiction to review decisions under the PSOBA but that the Court of Federal Claims does have jurisdiction.").

8. Mr. Holstine was accompanied in the plane and directed by a CDF employee at the time of his death. AR at 139. Mr. Groff was flying solo. *Id.* at 23, 27. There are other factual differences;

for example, different contractors employed Mr. Holstine and Mr. Groff. AR at 139, 719.

9. The court will address changes to PSOBA that are relevant to plaintiffs' claim *infra.*

10. *See supra* note 5.

11. The rejection of the Holstine claim also depended on a fact-specific analysis of Mr. Holstine's services under the "similar relationship" and "official recognition" tests. AR at 137–38. Those tests, as discussed *supra,* are entitled to *Chevron* deference. Whether or not those tests were properly applied in the Holstine claim rejection is not a question before the court. Defendant and the BJA also derive some support from dicta in *Chacon v. United States,* 32 Fed.Cl. 684 (1995), *aff'd,* 48 F.3d 508 (Fed.Cir.1995), stating

Def.'s Reply at 14 ("Congress intended that privately-employed individuals—even privately employed individuals performing services of a security or safety nature who are called upon by public agencies to assist in their efforts—not be covered by the PSOBA."). Because the BJA's interpretation of PSOBA is entitled to *Skidmore* deference, the court will compare the BJA's analysis of legislative intent with its own review, and measure whether, under *Skidmore,* the BJA's conclusion that contractors are never public safety officers under PSOBA is persuasive. Indeed, this court must examine legislative history to discern congressional intent when ambiguous statutory terms permit contrary readings which would decide a case before it. *See Hoechst Aktiengesellschaft v. Quigg,* 917 F.2d 522, 526 (Fed.Cir. 1990) ("When faced with such ambiguity [opposing plausible interpretations] it is incumbent upon this court to examine the legislative history to discern Congress' intent."); *see also Yanco v. United States,* 258 F.3d 1356, 1364–65 (Fed.Cir.2001) (examining the legislative history of PSOBA and upholding an implementing regulation because it was a permissible construction of the statute); *Harold v. United States,* 225 Ct.Cl. 168, 634 F.2d 547, 549–52 & nn. 4–5 (1980) (examining the legislative history of PSOBA and disagreeing with a Department of Justice interpretation of a statutory term because that interpretation "can[not] be construed as anything but a contradiction of the Congressional understanding of the [PSOBA] term").

### a. The Legislative History of PSOBA Does Not Reveal an Intent to Categorically Exclude Contractor Firefighters from the Definition of Public Safety Officers

■ The legislative history of PSOBA indicates that PSOBA was intended by Congress to compensate the families of law enforcement personnel and firefighters who die during the course of their service. Congress recognized that public safety officers are not highly paid, and that they perform a public

service at high risk of personal injury and death. In the words of Senator McClellan, one of the sponsors of the legislation creating PSOBA awards,

> In my opinion, the motivation for this legislation is obvious—public safety officers are constantly subjected to great physical risks, the financial and fringe benefits available to such officers are only moderate, and the officers are generally young and with growing families. The economic and financial burdens on the survivors of such an officer are often heavy.

> More than 200 policemen and firemen are killed each year in the performance of their duties.

122 Cong. Rec. 22633, 22634 (1976) (statement of Sen. McClellan). These sentiments are repeatedly echoed throughout PSOBA's legislative history, in both houses of Congress, and show that Congress wished to pay a debt of gratitude to law enforcement personnel and firefighters who die in the performance of their duties.

Other considerations included improving the morale of firefighters and law enforcement personnel, and aiding the recruitment of new members into these professions. In the House, for example, there were numerous comments about the need for incentives to draw qualified people into law enforcement:

> As the figures indicate, law enforcement has become an increasingly hazardous profession. A law enforcement officer has the right to expect that his wife and his children will be financially secure should he lose his life while on the job. The fear of leaving a family uncared for is a disincentive to the type of individual responsible and high-quality law enforcement needs.

> We are not talking about volunteer lifeguards or individuals who with a momentary spurt of courage help out a neighbor or a friend, but people who devote their life to a dangerous career in order to promote the public safety.

that "one who works for a government contractor does not thereby acquire the requisite relationship to the contracting agency." *Id.* at 688 (citing the 1981 BJA policy letter). Decedents in

that case were not working for government contractors; the court declines to follow dicta which is not binding precedent.

122 Cong. Rec. 12002, 12017 (1976) (statement of Rep. Gude). When referring specifically to firefighters, supporters of PSOBA were concerned about morale:

> In addition to providing direct financial compensation to the dependents of deceased firefighters, it was indicated by most of the witnesses before the committee that this legislation will improve the morale of firefighting personnel.

*Id.* at 12022 (statement of Rep. Eilberg).

PSOBA supporters were also concerned about the recruitment of firefighters:

> I feel we must respond to the tragic loss of life by firefighters. Each day, these brave public servants lay their lives on the line, not knowing whether they will ever return to their families. As a group, they have never been highly paid and if they are killed, their dependents must rely on a patchwork system of State insurance programs and voluntary contributions by local citizens. If States and municipalities provided adequate life insurance this bill would not be needed, but such is not the case. The lack of financial security for one's dependents can discourage otherwise enthusiastic candidates from entering these dangerous professions.

*Id.* (statement of Rep. Fish). The same goal of aiding the recruitment and morale of public safety officers was expressed in the Senate:

> Clearly this bill will be an incentive to help in those recruitment [law enforcement and firefighting personnel] needs. The bill will not only aid in recruitment, but it will dramatically improve the morale of our public safety officers, morale which I believe needs an uplift.

122 Cong. Rec. 22633, 22644 (1976) (statement of Sen. Moss). Congress intended that PSOBA awards would help public agencies recruit firefighters and maintain their morale.

The version of the firefighter death benefit bill passed by the House referred, in pertinent part, to "any individual serving, with or without compensation, as a firefighter ... [who dies while] actually and directly engaged in fighting a fire." 122 Cong. Rec.

12002, 12026 (1976). The parallel bill in the Senate, which covered both law enforcement personnel and firefighters, defined fireman to "include[ ] a person serving as an officially recognized or designated member of a legally organized volunteer fire department" and also defined an umbrella term, "public safety officer," to "mean[ ] a person serving a public agency in an official capacity, with or without compensation, as a law enforcement officer or a fireman." 122 Cong. Rec. 22633, 22633 (1976). The court notes that neither of these bill versions explicitly excludes *contractors* who serve as firefighters for a public agency. Because Mr. Groff was a firefighter, a category included in both bills under consideration in 1976, it is important to examine the floor debates on these bills to see if both houses of Congress came to a consensus as to whether firefighters who performed services as contractors for public agencies would be excluded from PSOBA coverage.

The BJA cites to one colloquy in the House, and one colloquy only, as proof of the legislative intent to exclude contractors from PSOBA:

> Rep. Myers: "Could the gentleman tell me, is there any way in which this bill would apply to privately employed safety or security officers?"
>
> Rep. Eilberg: "No, it would not."
>
> Rep. Myers: "What if they were called by a local arm of the government or the local police organization to assist in any way?"
>
> Rep. Eilberg: "It is my opinion that they would not be included."

122 Cong. Rec. 12002, 12009 (1976); AR at 138–39; 896 n. 14. This is extremely weak support for categorically excluding contractor firefighters from PSOBA, for the reasons discussed below. These few cited lines, out of hundreds of pages of the legislative history on these two bills in the House and Senate largely expressing gratitude to firefighters and law enforcement officers who sacrifice their lives in the line of duty, do not accurately mark the intent of Congress in granting or denying PSOBA benefits for the survivors of contractor firefighters.

First, this cited debate fragment is extracted from the House debate on the law

enforcement officer death benefit bill, not the firefighter bill. Although the bills were companion bills, at this point in the House consideration of the two bills the language identifying covered firefighters was different from the language identifying covered law enforcement personnel. *Compare* 122 Cong. Rec. 12002, 12026 (1976) (including "any individual serving, with or without compensation, as a firefighter ... [who dies while] actually and directly engaged in fighting a fire.") *with* *id.* at 12013 (including "any individual serving, with or without compensation, a public agency in an official capacity as a law enforcement officer who [at the time of his death had been engaged in apprehension or attempted apprehension of persons connected with a crime, protection of witnesses, prevention of crimes, or performance of potentially dangerous duties].)" Thus, this debate fragment is largely irrelevant to the issue of PSOBA coverage for contractor firefighters, and reflects poorly on the thoroughness of the BJA's analysis of PSOBA's legislative history.

Second, there is a marginally better House debate fragment which the BJA overlooked in its analysis. Representative Myers again engaged Representative Eilberg in a discussion of the meaning of PSOBA's proposed statutory terms, this time for the firefighter bill and to clarify the words "any individual serving, with or without compensation, as a firefighter ... [who dies while] actually and directly engaged in fighting a fire." These are the most relevant snippets of a series of hypothetical situations discussed:

> Rep. Myers: "Could the chairman tell me if people who are involved in preparation of fire equipment who are not members of a fire organization, but are hired by that organization, and were to be killed, would they be covered?"
>
> Rep. Eilberg: "I would say 'no.' "
>
> Rep. Myers: "Would the gentleman also respond to the possibility of a good samaritan activity, a volunteer who is not on the roll of a volunteer organization"?
>
> Rep. Eilberg: "He would not be covered."
>
> . . . .
>
> Rep. Myers: "What specifically would constitute membership in a firefighting organization"?
>
> Rep. Eilberg: "The bill defines fireman to include a volunteer of a legally organized volunteer fire department, and such firemen are covered when they are actually and directly engaged in fighting fires."
>
> . . . .
>
> Rep. Myers: "What about the man who is not a member of a firefighting organization? Is he covered?"
>
> Rep. Eilberg: "No."

122 Cong. Rec. 12002, 12022–23 (1976).

We learn, at most,[12] from this colloquy that the House bill does not cover preparers of fire equipment, that in the House bill membership in a fire department includes volunteers (although we do not learn who is not a member), and that in the House bill nonmembers of fire departments are not covered. The court notes, however, that it is the Senate version of firefighter coverage that is adopted by both houses of Congress and becomes law, not the House version. To the court's knowledge, there is absolutely no

---

12. The tactic of interrogating the sponsor of a bill to narrow the meaning of the proposed legislative terms, for the announced purpose of establishing "some legislative history," 122 Cong. Rec. 12002, 12022 (1976), has been criticized because it creates deceptive " 'planted' legislative history" and does not reveal true congressional intent. *Harold v. United States*, 225 Ct.Cl. 168, 634 F.2d 547, 553 (1980) (Nichols, J., concurring). Judge Nichols commented that planted history is "an attempt to insert statutory language neither House has voted on, nor has the language gone before the President for his signature or veto." *Id.* Judge Nichols cautioned that "[w]hatever else a planted history may de facto achieve, it should not be allowed to hoodwink simple characters out in the boondocks who still suppose they can ascertain what Congress intends by procuring and reading the statutes." *Id.* at 554. Although not quite so dismissive as Judge Nichols, the Court of Claims in *Harold* discounted a colloquy in PSOBA's legislative history involving Representative Eilberg, similar to the one at issue here, by quoting Justice Frankfurter: " 'A loose statement even by a chairman of a committee, made impromptu in the heat of debate, less informing in cold type than when heard on the floor, will hardly be accorded the weight of an encyclical.' " *Id.* at 551 (citation omitted).

debate in the Senate on the topic of the scope of the term "serving a public agency in an official capacity." Because the House acquiesced to Senate language defining the scope of coverage for firefighters, H.R.Rep. No. 94–1501, at 5 (1976), the debate in the House clarifying statutory terms that were never enacted as law carries little to no weight in determining the legislative intent of Congress.

The court has reviewed the extensive legislative history of PSOBA and recognizes therein an impulse to remedy a situation where the survivors of law enforcement personnel and firefighters who have perished in the line of duty are left with financial struggles. This is an expansive and generous impulse, not a cramped and miserly one. The BJA has incorrectly read a tiny fragment of the floor debates of the House to overrule that effort. Laws providing for financial compensation in cases of injury and death are remedial in nature, and must be liberally construed to achieve their purpose and "to avoid incongruous or harsh results." *Baltimore & Philadelphia Steamboat Co. v. Norton,* 284 U.S. 408, 414, 52 S.Ct. 187, 76 L.Ed. 366 (1932) (stating that such laws "are deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results") (citation omitted); *see also Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953) (citing *Baltimore & Philadelphia Steamboat); Lykes Bros. S.S. Co. v. United States,* 206 Ct.Cl. 354, 513 F.2d 1342, 1353 (1975) ("It is generally recognized that remedial legislation should be construed liberally in order to effectuate its purpose.") (citations omitted); *White v. United States,* 122 Ct.Cl. 31, 102 F.Supp. 585, 586 (1952) (stating that "remedial legislation [is] to be liberally construed") (citations omitted). Under Skidmore deference, the BJA's categorical denial of PSOBA coverage for contractor firefighters cannot be upheld, because its reasoning is not thorough, not logical and not persuasive, especially in light of the stated remedial purpose of PSOBA.

The court has also reviewed subsequent amendments to PSOBA, to see if these amendments indicate a general narrowing of the scope of coverage for public safety officers.[13] There is none; in fact, Congress has repeatedly broadened coverage for public safety officers. For example, in 1986 personnel serving on rescue squads and ambulance crews were added, in 2000 FEMA employees and local emergency management and civil defense officials were added, and in 2002 chaplains were added, all now covered by PSOBA if certain conditions are met. *See* 42 U.S.C.A. § 3796b Notes (West 2003). Congress also acted in 2003 to broaden the coverage for public safety officers who die of heart attacks or other occupational illnesses while on duty or shortly thereafter. *See* 149 Cong. Rec. S2840, S2855 (2003) (statement of Sen. Leahy). Senator Leahy, one of the sponsors of the Hometown Heroes Survivors Benefits Act of 2003, now codified at 42 U.S.C. § 3796(k), described the goal of that legislation:

> When establishing the PSOB Program, Congress placed only three limitations on the payment of benefits. No award could be paid, first, if the death was caused by the intentional misconduct of the officer or by such officer's intention to bring about his own death; second, if voluntary intoxication of the officer was the proximate cause of such officer's death; or, third, to any person otherwise entitled to a benefit if such person's action was a substantial contributing factor to the death of the officer.

In years following, however, the Justice Department began to interpret the Program's guidelines to exclude from benefits the survivors of public safety officer[s] who die of a heart attack or stroke while acting in the line of duty, arguing that the attack must be accompanied by a traumatic injury, such as a wound or other condition of the body caused by external force, including injuries by bullets, smoke inhalation,

---

**13.** This review is by no means an exhaustive explication of all of the changes to PSOBA since 1976. The court will discuss *infra* in Section III.C.2.b of this opinion another significant change to PSOBA that was passed by Congress in response to the September 11, 2001 terrorist attacks.

explosives, sharp instruments, blunt objects or other physical blows, chemicals, electricity, climatic conditions, infectious diseases, radiation, and bacteria. Barred are those who suffer from occupational injuries, such as stress and strain.

Service-connected heart, lung, and hypertension conditions are silent killers of public safety officers nationwide. The numerous hidden health dangers dealt with by police officers, firefighters and emergency medical personnel are widely recognized, but officers face these dangers in order to carry out their sworn duty to serve and protect their fellow citizens.

Our multi-partisan bill would effectively erase any distinction between traumatic and occupational injuries. The Hometown Heroes bill will fix the loophole in the PSOB Program to ensure that the survivors of public safety officers who die of heart attacks or strokes in the line of duty or within 24 hours of a triggering effect while on duty regardless of whether a traumatic injury is present at the time of the heart attack or stroke are eligible to receive financial assistance.

I was serving my first term in the Senate when this program was established, and I firmly believe that this is what Congress meant for the survivors of our Nation's first responders to receive through the Public Safety Officers Benefits Program.

*Id.* When Congress wanted to add an exclusion to the limited number of exclusions from PSOBA coverage, it knew how to do so, such as in 1984 when grossly negligent behavior was added to the list of death-causing behaviors preventing an award of PSOBA benefits. Pub.L. No. 98–473, Title II, § 609F, 98 Stat. 2099 (1984) (codified as amended at 42 U.S.C. § 3796a(3)).

Thus, the subsequent amendments of PSOBA show no legislative intent to narrowly define "serving a public agency in an official capacity" as categorically excluding contractor firefighters. The legislative history of PSOBA as a whole indicates that Congress was desirous of compensating the survivors of firefighters killed in the line of duty, and that legislative history does not support the

BJA's narrow and cramped reading of PSOBA so as to categorically ban PSOBA coverage for contractor firefighters. Therefore, the court does not find the ban on PSOBA coverage to be persuasive under *Skidmore* deference. Even if the BJA's reading of the statute were entitled to *Chevron* deference, the court would find the categorical ban to be unreasonable and impermissible under the more deferential standard, in light of PSOBA's remedial purpose and legislative history.

**b. Do PSOBA Awards to the Survivors of Private–Sector Employees after the September 11, 2001 Terrorist Attacks Mean that the Denial of Plaintiffs' PSOBA Claim Was Arbitrary or Capricious?**

Plaintiffs argue that because the survivors of some non-governmental employees were awarded PSOBA benefits by the BJA during the aftermath of the September 11, 2001 terrorist attacks, denying PSOBA benefits to Mr. Groff' s family is arbitrary. Plaintiffs contend that "Defendant's providing benefits to 9/11 rescue workers confirms that privately-employed individuals are not per se disqualified from coverage as Defendant now maintains and Defendant has arbitrarily excluded Mr. Groff from coverage." Pls.' Mot. at 30. Plaintiffs also argue that "[t]here is no distinguishable circumstance" between the situation of privately-employed emergency medical services personnel who died in New York City during the 9/11 attacks, and the death of Mr. Groff fighting wildfires in California. *Id.* at 29–30.

The court disagrees with plaintiffs' conclusion that the BJA has acted arbitrarily and capriciously in treating terrorism-related deaths differently from deaths unrelated to terrorism. Congress established a new and different process for reviewing applications for PSOBA benefits for the survivors of rescue workers who perish in terrorism-related disasters, as discussed *infra*. The BJA evidently believed it was following two different congressional mandates for the two types of claims. Creating two disparate schemes of claims review, which produce harsh results for those not favored by Congress' attention

to terrorism, is not arbitrary, in itself. The court's fundamental concern with the BJA's denial of the PSOBA claims of plaintiffs is one of substantial compliance with PSOBA and the "similar relationship" and "official recognition" tests that define "serving a public agency in an official capacity." Before turning to that dispositive issue, the court addresses plaintiffs' argument concerning the disparate treatment of Mr. Groff and the private sector employees who died in the 9/11 disaster.

The loss of life and the chaotic aftermath of the terrorist attacks in New York City on September 11, 2001 were unique circumstances. *See* AR at 636 (BJA claim determination) (estimating that "approximately four hundred emergency personnel were killed during rescue attempts" related to the collapse of the World Trade Center towers in New York City). Congress acted quickly to change the process by which the BJA would review PSOBA claims related to the attacks. Within a week of September 11, 2001, an expedited PSOBA benefits process was established by law for public safety officers who died during rescue attempts related to the September 11, 2001 attacks. *See* Expedited Payment for Heroic Public Safety Officers, Pub.L. No. 107–37, 115 Stat. 219 (2001). As a result, the BJA had only thirty days after receipt of "certification by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury as a direct and proximate result of a personal injury sustained in the line of duty . . . in connection with the rescue or recovery efforts related to the terrorist attacks of September 11, 2001" to issue payment to the survivors of the public safety officer. *Id.*

When answering inquiries from a trade association of ambulance companies on October 1, 2001, the BJA explained that PSOBA benefits had been extended to cover private rescue workers "[d]ue to the circumstances and scope of the tragic events in question." AR at 695. The survivors of these workers could apply "through the Fire Department of New York (FDNY) or appropriate local government agency provided that the agency certifies that the individuals were acting in an official capacity under the supervision of that agency." *Id.* Thus, the BJA apparently understood the intent of Congress, in its passage of the Expedited Payment for Heroic Public Safety Officers Act, to unreservedly include privately employed rescue workers in the definition of public safety officers, if these workers had been swept up in the response to the 9/11 attacks and a public agency certified that their service was in an official capacity. Moreover, the BJA read the statutory requirement of a payment within thirty days after receipt of the certification from a public agency to mean that the certification, in these circumstances, replaced the role of the BJA as the arbiter of whether that decedent qualified as a public safety officer who died in the line of duty. That interpretation of the Expedited Payment for Heroic Public Safety Officers Act is not obviously unreasonable, because the Act does indeed appear to circumvent any need for deliberation by the BJA as to PSOBA eligibility, as far as the 9/11 attacks were concerned.

With the passage of the USA Patriot Act, Congress expanded the use of expedited processing of PSOBA awards to deaths "in connection with prevention, investigation, rescue or recovery efforts related to a terrorist attack." *See* USA Patriot Act, Pub.L. No. 107–56, §§ 611–12, 115 Stat. 369 (2001) (codified at 42 U.S.C. § 3796c–1). The USA Patriot Act version of the expedited processing of PSOBA benefits in deaths related to terrorist attacks retains the requirement of payment within thirty days of the public agency's certification of the death. *Id.* As a result, the BJA, for a variety of claimants in the aftermath of the 9/11 attacks, accepted public agency certifications of public safety officer deaths in the line of duty as *prima facie* evidence of PSOBA eligibility in those terrorist attack situations. AR at 903.

It may be that the BJA interpretation of the interaction between the expedited payment provision of the USA Patriot Act and the BJA's duty under PSOBA to determine who is eligible for PSOBA benefits is somehow flawed. That issue is not before the court, because plaintiffs here do not challenge the BJA's PSOBA awards to the sur-

vivors of privately employed rescue workers who died in the 9/11 attacks. Rather, they argue that the denial of PSOBA benefits to Mr. Groff's survivors is arbitrary and capricious in light of the earlier PSOBA awards to non-government employees in the 9/11 situation. The disparity might be unfair in a moral sense, but the BJA review processes have not been shown to be arbitrary or capricious.

An executive branch action which conforms to statutory imperatives is not arbitrary or capricious. Plaintiffs characterize the different treatment of Mr. Groff and the 9/11 decedents as "utterly hypocritical" and impossible to "rationalize." Pls.' Mot. at 29. Yet, the BJA "similar relationship" and "official recognition" tests for public safety officer deaths unrelated to terrorism are not unreasonable. *Chacon*, 48 F.3d at 512. The expedited processing of PSOBA claims for terrorism-related deaths also appears to be a reasonable expression of the USA Patriot Act. Thus, the difference in the BJA treatment of plaintiffs here and of the survivors of the 9/11 rescue workers is not arbitrary or capricious, although it may be logically inconsistent or even morally unjustifiable.

The court has a " 'duty . . . to observe the conditions defined by Congress for charging the public treasury.' " *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (quoting *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). It cannot order the BJA to extend expedited processing of PSOBA claims beyond the limits that Congress has set. The court does note, however, that the authorization of expedited processing of PSOBA claims for the survivors of privately-employed public safety officers in terrorism attacks, and the PSOBA awards made to the families of private-sector employees by the BJA under the mandate of the USA Patriot

Act, provide a concrete example of Congress treating private sector and public sector employees as indistinguishable in the context of PSOBA awards. This is further evidence that the BJA has misread the remedial spirit of PSOBA in narrowly interpreting the scope of "serving a public agency in an official capacity."

### 3. Does Mr. Groff's Provision of Services to the CDF Meet the "Similar Relationship" and "Official Recognition" Tests?

#### a. Similar Relationship

The record presents an abundance of evidence concerning Mr. Groff's employment as an airtanker pilot. Defendant highlights the employer-employee relationship between SJH and Mr. Groff, and cites documents which establish that relationship in matters such as wages, benefits, workplace policies regarding alcohol consumption and sexual harassment, and disciplinary procedures. *See* AR at 719, 725, 729–30, 733–34, 825; Def.'s Facts ¶¶ 1–10; Def.'s Add'l Facts ¶¶ 2–11. This evidence is largely undisputed and shows that Mr. Groff was the employee of a contractor for the CDF, not a CDF employee. Defendant's cited evidence, however, does not describe the nature of Mr. Groff's work. Because the "similar relationship" test requires a review of the performance of Mr. Groff's services, the court must turn to the portion of the record that is cited by plaintiffs.

Plaintiffs cite two types of evidence which go to the issue of whether Mr. Groff was much like a CDF employee, in a "similar relationship of performing services as a part of a public agency." The first type of evidence is the procedures handbook for pilots fighting fires for the CDF.[14] AR at 285–635.

---

14. Defendant complains that the handbook was revised after Mr. Groff's death and asserts that the revised handbook version submitted by plaintiffs to the BJA does not "establish[ ] . . . the terms and conditions of Mr. Groff's employment when he died on August 27, 2001." Def.'s Counterstatement of Facts ¶ 19. Plaintiffs submitted the 2002 CDF website version of the pilot handbook to the BJA on February 9, 2005. AR at 150, 285–635. Although the BJA contacted plaintiffs after receiving the supporting materials for their appeal to the BJA Director, and requested other documentation necessary for the BJA Director's review, the BJA did not request a copy of the 2001 version of the handbook. AR at 702A. Pursuant to 28 C.F.R. § 32.21(b) (2002), the BJA must inform claimants when they have submitted insufficient evidence on a material issue or fact for their PSOBA claim. *Id.* ("Whenever a claimant for any benefit or fee under the Act and this part has submitted no evidence or

Having reviewed this pilot handbook, the court finds that Mr. Groff was fully integrated into the firefighting services of the CDF.

During firefighting operations, contractor pilots such as Mr. Groff were supervised by a CDF air tactical group supervisor who would "ordinarily fly in an orbit above the level of the airtankers and ... describe targets to the airtanker and helicopter pilots." [15] AR at 404. The CDF dispatched the planes flown by pilots such as Mr. Groff, *id.* at 372, and specified what uniforms those pilots would wear, *id.* at 352. Contractor pilots were required to participate in CDF debriefings (critiques of missions), *id.* at 381, and were evaluated by CDF personnel, *id.* at 381–82. Contractor pilots had CDF credit cards for refueling CDF planes. *Id.* at 385. Mr. Groff, from the evidence provided in the CDF aviation handbook, was functioning as a part of the CDF as he was performing firefighting services, much like a CDF employee.

Plaintiffs' second type of evidence is found in two letters from a CDF official describing the nature of Mr. Groff's services and his relationship to the CDF. AR at 34, 247–48. The first letter, written on September 3, 2002, lists various aspects of Mr. Groff's firefighting services, and was composed by W. David Wardall, the CDF Deputy Chief of Aircraft Maintenance and Engineering. *Id.* at 247–48. The second letter was written a few days later by Mr. Wardall, *id.* at 34; both letters were submitted to the BJA to explain Mr. Groff's role within the CDF.

The court reproduces Mr. Wardall's first letter, almost in its entirety, because it is highly relevant to the "similar relationship" test:

> Mr. Eric Martin [of the BJA] called me last [sic] and advised that your Department has received the line-of-duty death claim package for one of our pilots, Cap-

tain Larry Groff. Eric asked if Captain Groff was an employee of CDF or San Joaquin Helicopters. The Coroners Death Certificate listed San Joaquin Helicopters as the employer. This is a true statement. The employer, San Joaquin Helicopters was merely a conduit to provide pay to our pilot. However, Captain Groff, was in our opinion, serving as an officially recognized and designated member of the California Department of Forestry and Fire Protection.

The State of California has submitted the PSOB death benefit application for Captain Groff because Larry Groff was the Pilot–in–Command of a State Airtanker responding to a State wildland fire. The following facts support our claim that Captain Groff was in fact "officially recognized and a designated member of the California Department of Forestry and Fire Protection and a State firefighter":

1. Larry Groff was an interagency "carded" Airtanker Pilot. This designation authorized and required Larry Groff to operate a State fire fighting airtanker as Pilot–in–Command. Larry had the authority, duty and obligation to respond to wildland fires and to take immediate and independent action to suppress and combat wildfires.

2. The State of California and the U.S. Government were the beneficiaries from the fire fighting flight operations.

3. Larry Groff operated a State airtanker for the State of California on State fires and mutual aid responses to Federal Agency fires.

4. Larry Groff operated a State owned airtanker at the direction of CDF dispatchers and airborne air attack 5. officers in command and control aircraft.

---

insufficient evidence of any material issue or fact, the Bureau shall inform the claimant what evidence is necessary for a determination as to such issue or fact and shall request the claimant to submit such evidence within a reasonably specified time."). Because the BJA did not demand an older version of the pilot handbook from plaintiffs, the court accepts the handbook in the record as acceptable evidence to be accorded some weight. Defendant was asked if "the government ha[s] any reason to believe that the

revised handbook changed in any significant fashion the matters specifically referenced by the Plaintiffs." Oral Argument Transcript (Tr.) at 11. Defendant responded "No." *Id.*

15. On the day of his death, Mr. Groff was performing services under the supervision of a CDF air tactical group supervisor flying above his airtanker. AR at 25.

5. Larry Groff slept at State airtanker bases with other State firefighters, ate State furnished meals and wore a State supplied flight suit and helmet.

6. Larry was the final authority and responsible for the safe operation of the State Airtanker.

7. Larry had the authority as a State firefighter pilot under the Federal Aviation Regulations to close airspace to civil aircraft, to get priority handling from the FAA on airspace use, and to give orders as necessary to suppress wildland fires.

. . . .

The State of California is submitting the above information for the wife and children of Airtanker Pilot Lawrence L. Groff, SSN[ ].

I certify under the penalty of perjury that Larry Groff was performing the duties of Pilot–in–Command on a State airtanker, was duly recognized and designated as firefighter pilot by the State of California, Department of Forestry and Fire Protection and was killed in the line-of-duty.

The State of California hereby requests that the Department of Justice to provide an affirmative determination that Captain Groff' s wife and children are entitled to the Federal Firefighter death benefit. Thank you for your consideration and assistance! If you have any questions, please call me.

AR at 247–48. Mr. Wardall's second letter is also relevant and adds further detail:

The only function of the contractor [SJH] was to provide a means to pay long term (contract) employees. Typically, our pilots and maintenance technicians have 20 to 30 years of service and are retained from contract to contract because of the extensive knowledge and experience.

We also set pilot standards, must approve the hiring of each pilot, train the pilots, check ride and finally card the pilots for State duty. The pilots were and continue to operate aircraft with the full authority of a State firefighter pilot. The sole function of the contractor was/is to provide a means of paying the pilots and maintenance technicians.

Id. at 34. These letters written by Mr. Wardall show that Mr. Groff was fully integrated into the CDF and was performing services as a part of the CDF much like a CDF employee.

■ Fact findings by the public agency whose public safety officer has died are entitled to substantial weight as the BJA reviews a PSOBA claim. Demutiis v. United States, 291 F.3d 1373, 1379 (Fed.Cir.2002) (citing 28 C.F.R. § 32.5 (2001)). On the other hand, legal conclusions made by the public agency whose public safety officer has died are not entitled to the same deference by the BJA when those conclusions concern the PSOBA eligibility of the decedent's survivors. See id. ("The [BJA] regulation . . . requires the [BJA] to give substantial weight only to 'the evidence and findings of fact presented by . . . administrative and investigative agencies,' not to their legal conclusions.") (quoting 28 C.F.R. § 32.5). The determination of who is, and who is not, a public safety officer is vested in the BJA, at least for deaths not related to terrorism. See 42 U.S.C. § 3796(a) ("In any case in which the Bureau of Justice Assistance . . . determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit . . . ."); id. § 3796c(b) ("Responsibility for making final determinations shall rest with the Bureau."); see also supra Section III.C.2.b of this opinion discussing amendments to PSOBA since September 11, 2001. When the CDF described the work performed by Mr. Groff and his relationship with the CDF, these are fact findings by the CDF that should have been accorded substantial weight by the BJA in its PSOBA claim review.

■ Here, it does not appear that the BJA gave substantial weight to Mr. Wardall's evidence of Mr. Groff' s relationship with the CDF. Rather, the BJA did not look beyond the SJH contract with the CDF and Mr. Groff' s personnel records with SJH. Although Mr. Wardall described SJH as a pay

conduit, with the payment of pilots and technicians being its sole function as a contractor, the BJA disagreed and concluded that because Mr. Groff was an SJH employee he could not have functioned as a part of the CDF. This analysis does not give Mr. Wardall's facts any weight, and appears to avoid inquiring into the nature of Mr. Groff's provision of services to the CDF. The BJA has either failed to comply with its own test for determining if a non-employee is nonetheless in a "similar relationship" to a public agency, or has given insufficient weight to the only relevant facts in the record concerning the day-to-day services provided to the CDF by contractor pilots such as Mr. Groff.

The BJA was required to give substantial weight, see *Demutiis*, 291 F.3d at 1379, to all of Mr. Wardall's factual statements concerning Mr. Groff's duties, working conditions, supervision, and "authority as a State firefighter pilot," AR at 247. While the BJA conceded that "CDFFP directed Mr. Groff in the performance of his duties," *id.* at 899, it nonetheless concluded that plaintiffs "have not shown that Mr. Groff was a public safety officer serving a public agency in an official capacity," *id.* at 902. The court has arrived at a wholly contrary conclusion after an analysis of the dispositive facts in this matter and has determined that the record demonstrates that Mr. Groff is a clear example of a nonemployee who nonetheless is similarly providing services as a part of public agency, much like a public employee.

The BJA relies not on Mr. Wardall's detailed fact findings that Mr. Groff provided services as a part of the CDF, but on the boilerplate paperwork memorializing Mr. Groff's relationship with SJH. The BJA found that SJH had "a clearly superior right of control as his employer, *i.e.*, the company could remove Mr. Groff from his assignment to the CDFFP at any time and could other-wise direct the performance of his duties other than when he was flying on a CDFFP mission." AR at 899–900. This analysis is flawed. Properly giving Mr. Wardall's statements substantial weight, it is evident that the CDF controlled the hiring, training, licensing, and equipping of Mr. Groff, and well as the supervision, task assignments and evaluation of Mr. Groff. Mr. Groff's signature on a variety of SJH personnel forms offers insufficient evidence that SJH had a superior right of control over Mr. Groff's performance of firefighting services, the crucial test at issue here. And although SJH paid Mr. Groff's wages and had the right to remove him from his position, it appears that the CDF had a similar influence over these matters.[16]

The BJA also relied on the SJH–CDF contract provisions relieving the CDF from liability if injuries were caused by Mr. Groff's performance of services, and asserting that SJH employees act in an independent capacity. AR at 899. While this boilerplate language might be pivotal in a tort claims action, this does not overcome Mr. Wardall's evidence, due substantial weight, that Mr. Groff functioned within the CDF, providing services much like a CDF employee. Mr. Groff's legal relationship with SJH as his employer did not preclude his having had, at the same time, a functional relationship with the CDF. To find otherwise is to blindly apply a categorical ban on contractor employees being covered by PSOBA, a ban unsupported by the legislative history of the statute, and to avoid examining Mr. Groff's services under the "similar relationship" test.

The court finds that Mr. Groff was performing services as a part of the CDF, and that his service meets the "similar relationship" test for "serving a public agency in an official capacity."

---

16. The SJH contract with the CDF specified a minimum hourly wage and a minimum package of benefits, including health, dental and vision care, for the contractor pilots. AR at 825. The amount of wages paid to Mr. Groff in his final months with SJH appears to have been the product of a negotiation process involving the CDF, SJH and the pilots. *See* AR at 766 (SJHCDF contract amendment 8 dated July 6, 2001) ("This amendment adds money to the agreement for pilots' negotiated raise of 29%.... Contractor's original rates were established under the 1995 bid. This amendment replaces rates submitted in amendment 7 to include the State's responsibility of an additional 9% for a total obligation of 17% of the contractor pilot job action negotiated increase of 29% over the 2000 fire season rates."). The CDF also had the power to revoke the flying privileges of pilots such as Mr. Groff. *Id.* at 532.

### b. Official Recognition

Plaintiffs point to ample evidence of official recognition by the CDF of Mr. Groff' s services, in support of their contention that he was "officially recognized or designated as functionally within or a part of the public agency." Some of this recognition implies that Mr. Groff was functionally part of the CDF. For example, Mr. Wardall refers to Mr. Groff as "one of our pilots." AR at 247. Mr. Wardall also refers to Mr. Groff as a "State firefighter pilot." *Id.* But the CDF also directly addressed the issue of official recognition and Mr. Groff' s role within the CDF:

Captain Groff was, in our opinion, serving as an officially recognized and designated member of the California Department of Forestry and Fire Protection. . . . The following facts support our claim that Captain Groff was in fact "officially recognized and a designated member of the California Department of Forestry and Fire Protection and a State firefighter":

1. Larry Groff was an interagency "carded" Airtanker Pilot. This designation authorized and required Larry Groff to operate a State fire fighting airtanker as Pilot–in–Command. Larry had the authority, duty and obligation to respond to wildland fires and to take immediate and independent action to suppress and combat wildfires.

. . . .

8. Governor Gray Davis issued a State-wide proclamation designating Larry Groff as a firefighter and a hero. Gray Davis is the current Governor, State of California.

9. Larry Groff' s name has been added to the State firefighter's memorial located in the State Capitol.

10. Larry Groff' s name has been added to the national firefighter's memorial in Maryland.

*Id.* at 247–48. The court agrees with plaintiffs that Mr. Groff was officially recognized as being functionally within the CDF.

The BJA apparently chose to disregard the CDF"s official recognition that Mr. Groff was a functional part of the CDF. In the Final Agency Determination, the BJA Director states that "all claimant proffered were CDFFP assertions of 'official recognition of public safety officer status' which were made after Mr. Groff' s death and, at times, specifically for the well-intentioned, but mis-guided purpose of assisting the claimant in qualifying for the PSOB Federal benefit." *Id.* at 902. It is not perfectly clear from the record why the BJA felt Mr. Wardall's official recognition was insufficient under the "official recognition" test, but at least part of the BJA's reasoning appears to be based on an inappropriate adverse inference.

The BJA's rejection of Mr. Wardall's official recognition of Mr. Groff' s role within the CDF, as expressed in the Final Agency Determination, contains a footnote. That footnote states that the BJA was entitled to draw an adverse inference because plaintiffs did not produce any personnel files on Mr. Groff kept by the CDF. AR at 902 n. 30. This adverse inference is not justified.

When the Director of the BJA conducted his review of the denial of PSOBA awards to plaintiffs, he noted "two items that are not included in agency files which I believe would better inform my review and final agency decision." *Id.* at 702A. The first was an executed copy of the SJH–CDF contract. *Id.* The second item was "personnel documentation, including but not limited to any waivers of rights and death and/or disability benefit documentation, that was specific to Mr. Groff and that was maintained by San Joaquin Helicopters and, possibly, the California Department of Forestry and Fire Protection." *Id.* The BJA Director "ask[ed] that [Mr. Poretti, plaintiffs' counsel] provide [Mr. Herraiz, the BJA Director] with access to this documentation." *Id.*

Plaintiffs' counsel contacted SJH, enclosing a copy of Mr. Herraiz' letter, requesting Mr. Groff' s personnel files and the contract with CDF. *Id.* at 703. SJH apparently refused to provide the documentation requested, absent a subpoena. *Id.* at 704. Mr. Poretti wrote Mr. Herraiz, explaining his difficulty obtaining the requested documents, expressing his willingness to cooperate with

the BJA and stating that he was "open to discussing this matter further with you." *Id.*

The BJA subpoenaed the requested documents from SJH. *Id.* at 705. Once the BJA received the SJH–CDF contract and Mr. Groff's SJH personnel file, the BJA forwarded a copy to Mr. Poretti and mentioned that the record was still open "for the transmittal and review of these additional documents, the submission of additional documentation responsive to prior agency requests, as well as the submission of additional arguments, if any." *Id.* at 706. When the BJA notified Mr. Poretti that the comment period would be closed a month earlier than originally scheduled, pursuant to Mr. Poretti's request, the BJA noted that the original, longer "comment period … was intended to provide your client with ample opportunity to respond to the Director of BJA's prior requests for information, to review recently produced documents received from [SJH] and to comment on the record." *Id.* at 889A.

There is no indication in the administrative record of this case that Mr. Herraiz specifically demanded personnel documentation from the CDF that plaintiffs failed to provide. At most, Mr. Herraiz at one point informed plaintiffs that he might "possibly" require access to CDF personnel documentation concerning Mr. Groff. *Id.* at 702A. This vague allusion did not provide notice to plaintiffs that the BJA required these documents for Mr. Herraiz' review. Surely, after Mr. Poretti had pointed out his lack of subpoena power and the BJA had finally obtained, via subpoena to SJH, the SJH records Mr. Herraiz had specifically requested from Mr. Poretti, the BJA could have sent plaintiffs a clear request for CDF documentation if those documents were indeed of interest to Mr. Herraiz. Instead, the BJA continued to make vague allusions to "prior requests" from Mr. Herraiz without specifying that CDF personnel documentation, potentially identified in Mr. Herraiz' initial communication, was now definitely required by Mr. Herraiz.

Absent a specific and clear request from the BJA for access to CDF personnel files concerning Mr. Groff, the BJA is not entitled to draw an adverse inference from plaintiffs'

failure to produce those documents and/or authorize access to them. *See* 28 C.F.R. § 32.21(b) (2002) ("Whenever a claimant for any benefit or fee under the Act and this part has submitted no evidence or insufficient evidence of any material issue or fact, the Bureau shall inform the claimant what evidence is necessary for a determination as to such issue or fact and shall request the claimant to submit such evidence within a reasonably specified time. The claimant's failure to submit evidence on a material issue or fact *as requested* by the Bureau shall be a basis for determining that the claimant fails to satisfy the conditions required to award a benefit or fee or any part thereof.") (emphasis added). The BJA had several opportunities to unequivocally request of plaintiffs Mr. Groff's personnel documentation at the CDF, or permission to access these documents concerning Mr. Groff, and failed to do so.

After having received the communication from Mr. Poretti concerning the difficulties obtaining documents from SJH, it makes no sense that the BJA would require plaintiffs to get CDF documents for the BJA's review. The BJA could have sought such documents from Mr. Wardall at the CDF, who repeatedly suggested to BJA staff members that they call him if they had questions about plaintiffs' claims. AR at 34, 248. Or, the BJA could have used its subpoena powers, as it had with SJH. Pursuant to 28 C.F.R. § 32.5 (2002), the BJA "will request additional assistance or conduct its own investigation when it believes that the existing evidence [provided by the public agency] does not provide the Bureau with a rational basis for a decision on a material element of eligibility." *Id.* Because the BJA never made a clear request for CDF records from plaintiffs, the BJA is not entitled to draw an adverse inference from plaintiffs' entirely adequate response to the documentation requests clearly expressed by the BJA Director.

In view of the specific information that the CDF had already provided the BJA concerning Mr. Groff's status at the CDF, it is unclear whether "personnel" documents which might have been maintained by the CDF on a contractor employee such as Mr.

Groff would have been helpful in deciding plaintiffs' PSOBA claim. The evidence available to the BJA was sufficient to have determined the employment status of Mr. Groff, his functional role within the CDF and his official recognition by the CDF. An adverse inference against a PSOBA claimant is only appropriate where "no evidence or insufficient evidence" has been submitted. 28 C.F.R. § 32.21(b).

The CDF official, Mr. Wardall, quite specifically recognized that Mr. Groff was, in effect, a member of the CDF. AR at 247. In another mailing to the BJA, Mr. Wardall took the trouble to "certify that I am a State Officer." *Id.* at 21. The BJA's refusal to accept this official recognition that Mr. Groff was functionally within the CDF finds no support in the representations proffered by the CDF and is unwarranted.[17] The court finds that Mr. Groff was officially recognized and designated as being functionally within or a part of the CDF, and that his service meets the "official recognition" test established by the BJA.

## CONCLUSION

Because the BJA failed to correctly apply its tests for "serving a public agency in an official capacity" in conformance with 42 U.S.C. § 3796b(9)(A), failed to give substantial weight to the fact findings of the CDF as required by 28 C.F.R. § 32.5 and incorrectly drew an adverse inference regarding the sufficiency of "official recognition" evidence provided by the CDF in contravention of 28 C.F.R. § 32.21(b), the court finds that the BJA did not substantially comply with PSOBA and PSOBA's implementing regulations when denying plaintiffs PSOBA benefits. Having determined that Mr. Groff's service met the similar relationship test for serving a public agency in an official capacity and likewise, having determined that Mr. Groff was

officially recognized by the CDF, the court need go no further.

Accordingly, it is hereby **ORDERED** that

(1) Defendant's Motion for Judgment Upon the Administrative Record, filed December 18, 2005, is **DENIED;**

(2) Plaintiffs' Cross Motion for Judgment on the Administrative Record, filed on February 7, 2006, is **GRANTED;**

(3) The Clerk is directed to **ENTER** judgment for plaintiffs in the amount of $250,000.00, adjusted in accordance with 42 U.S.C. § 3796(h)-(i), paid as directed by 42 U.S.C. § 3796(a), in addition to any other benefits due plaintiffs under 42 U.S.C. §§ 3796–3796d–7, in accordance with this opinion; and

(4) Each party shall bear its own costs.

---

17. California now mandates that contracts for firefighter pilots shall include a provision which guarantees that the survivors of those pilots killed in the line of duty receive a payment in the amount of a PSOBA death benefit, if the BJA finds them ineligible for PSOBA benefits, as well as "[a]n amount, to be determined by [the CDF], that would be commensurate with the death benefit payable to a mid-career firefighter employed by the department who died in the line of duty." Cal. Pub. Res.Code § 4114.5(a)(1)-(2). This statutory provision does not help plaintiffs because it was introduced after Mr. Groff's death and the statute cannot be read to apply retroactively to the SJH–CDF contract in place at the time of Mr. Groff's death.