**Laurie H. LaBARE, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 05–907C.

United States Court of Federal Claims.

Aug. 2, 2006.

Joseph S. Lawder, Rider Bennett, LLP, Minneapolis, Minnesota, for plaintiff.

Timothy P. McIlmail, Trial Attorney; Jeanne E. Davidson, Deputy Director; David M. Cohen, Director, Commercial Litigation Branch; Peter D. Keisler, Assistant Attorney General, Civil Division, Department of Justice, Washington, DC, for defendant. Victoria O'Brien, Office of General Counsel, Office of Justice Programs, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

This case involves the untimely death of Craig LaBare, co-pilot of an aircraft that crashed on June 17, 2002, while delivering fire-retardant to a forest fire in California. The aircraft was on its sixth run to a fire near Walker, California at the time of the crash. According to the National Transportation Safety Board, immediately after the fire-retardant was released from the aircraft, the "wings were observed to separate from the aircraft and fire was also observed." Mr. LaBare suffered fatal injuries as a result of this tragic crash. He was only 36 years old.

Hawkins and Powers Aviation, Inc. is a private corporation that provides airtankers and airtanker services to the government for fire suppression pursuant to a contract with the Forest Service of the United States Department of Agriculture. Hawkins and Powers owned the C–130 airplane which crashed on June 17, 2002 and on which Mr. LaBare lost his life. The aircraft was under an Exclusive Use Contract to the United States Forest Service. The government

awarded the contract to Hawkins and Powers on December 17, 2001 for the project titled "National Airtanker Service." Under the contract, Hawkins and Powers was to be responsible for the aircraft equipment, aircraft maintenance, aircraft safety, and flight crews. Mr. LaBare was hired by, and received his hourly compensation from Hawkins and Powers.[1] The contract also provided that Hawkins and Powers Aviation, Inc. "shall be responsible for all damage to property and to persons," and the contractor was directed to obtain insurance.

On October 1, 2002, Laurie H. LaBare, Craig LaBare's widow, filed a claim with the Bureau of Justice Assistance, Office of Justice Programs, United States Department of Justice (hereafter BJA), for death benefits under the Public Safety Officers' Death Benefits Act of 1976, 42 U.S.C. §§ 3796–3796c (2000 & Supp. II 2002) (hereafter PSOBA). On October 16, 2003, after a review of her claim, the BJA issued an initial determination denying Ms. LaBare's claim for benefits. The BJA reviewed the Report of Public Safety Officer's Death submitted by the Department of Agriculture, the Claim for Benefits submitted by Ms. LaBare, as well as the evidence presented on the claim. The BJA stated that at the time of pilot Craig LaBare's death he was not an employee of the United States Forest Service, but rather an employee of Hawkins & Powers Aviation, Inc., a private corporation that had entered into a contract with the Forest Service. The BJA concluded that employees of private corporations are not public employees or agents of state or local government and, therefore, are not public safety officers as defined by the PSOBA. The BJA further concluded that because Craig LaBare was not a "public safety officer" as defined in 42 U.S.C. § 3796b(8),[2] the claimant, Laurie H. LaBare, was not entitled to receive PSOBA benefits.

On November 13, 2003, Laurie LaBare appealed the BJA's determination and re-quested an oral hearing to review the Bureau's finding of ineligibility. On May 11, 2004, after reviewing the evidence, including the documents submitted and the testimony offered by the witnesses, Dr. Voncile B. Gowdy, an independent hearing officer, who was not a Department of Justice employee, but who was under contract with the BJA, held a hearing for the BJA. Dr. Gowdy issued a decision on December 7, 2004. The decision sustained the BJA's initial determination and confirmed the denial of death benefits to the claimant, Laurie LaBare. Among the factual findings made by the hearing officer were the following:

> On June 17, 2002, Craig LaBare was a co-pilot on an aircraft which broke apart in flight while delivering fire retardant chemicals near Walker, California when three flight crewmembers were fatally injured and the airplane was destroyed.... The airplane was operated by the U.S. Department of Agriculture Forestry Service for the public use firefighting flight under 14 CFR Part 91. The airplane was registered to Hawkins and Powers Aviation, Inc., Greybull, Wyoming....
>
> ... Mr. LaBare was employed by Hawkins and Power Aviation, Inc., a private corporation that had entered into a contractual agreement with the United States Forest Service (USFS). There was no evidence, at the time of the claimant determination that he was hired as an employee of USFS or that he was on the payroll as an employee.

The hearing officer concluded that because at the time of his death, Mr. LaBare was not an employee of the government, but, rather, an employee of a private corporation, his widow was not entitled to death benefits pursuant to the PSOBA. Dr. Gowdy stated that in order to be serving a public agency in an official capacity, one must be an officer, employee, or volunteer, or have a similar relationship, performing services as a part of

---

1. According to the testimony of Ms. LaBare at the initial claim hearing, the United States Forest Service provided funds directly for personal expenses of pilots while they were stationed away overnight.

2. The decision cited the 1976 version of the PSOBA in which the definition of "public safety officer" was found at 42 U.S.C. § 3796b(8)(A). The PSOBA was amended in 2006 and the definition for "public safety officer" is now found at 42 U.S.C. § 3796b(9)(A) (West, Westlaw through 2006 amendments).

a public agency. No evidence was found by the hearing officer that a public agency had officially recognized or designated Mr. La-Bare as an employee or as a functional member of a public agency. The hearing officer concluded: "[I]t is my determination that the claimant is not eligible to receive a benefit, because Mr. LaBare was not a 'public safety officer' under the terms of the PSOB Act and implementing regulations."

On February 9, 2005, Ms. LaBare submitted additional documents to the BJA in support of her claim for benefits, and requested a review and reversal of the hearing officer's determination. The Office of Justice Programs reviewed Ms. LaBare's request, the record, and the additional evidence submitted, then issued a final agency determination on June 21, 2005, affirming the BJA and hearing officer's decisions to deny benefits to Ms. LaBare. Domingo S. Herraiz, the Director of the Bureau of Justice Assistance, adopted the factual findings of the hearing officer, and found the following:

1. At the time of his death, on June 17, 2002, the decedent was a pilot employee of H & P [Hawkins and Powers], a private-sector employer.

2. At the time of decedent's death, there was in effect a H & P/USFS [United States Forest Service] agreement ("Agreement") made as of December 17, 2001, pursuant to which H & P employee LaBare was rendering piloting services to the USFS.

3. Agreement ¶ I.32, regarding third-party liability, provides as follows:

   (1) The Contractor shall use every precaution necessary to prevent damage to public and private property.

   (2) The Contractor shall be responsible for all damage to property and to persons, including third parties, that occur as a result of his or his agent's or employee's fault or negligence. The term

"third parties" is construed to include employees of the Government.

(3) The Contractor shall procure and maintain during the term of this contract, and any extension thereof, aircraft public liability insurance in accordance with 14 CFR 298. The parties named insured under the policy or policies shall be the Contractor and the United States of America.

4. On June 17, 2002, the decedent was responding to a USFS-identified fire-suppression need requiring a flame-retardant delivery on a forest fire when the aircraft that he was co-piloting broke apart in a flight. The tragic airplane crash resulted in his death.

5. The claimant, decedent's widow, was deemed not eligible for and did not receive any Federal benefits as a result of the decedent's tragic death. [C]laimant nowhere represents that she ever applied for or received an award of Federal benefits, other than the pending PSOB claim . . . . (citations omitted).

The Director concluded that:

1. H & P is not a "public agency" within the meaning of the PSOB Act.

2. The POSB Act provides death benefits to certain survivors of "public safety officer[s who are] determine[d by BJA], under regulations issued pursuant to [the PSOB Act, to have] died as a direct and proximate result of a personal injury sustained in the line of duty." 42 U.S.C. § 3796(a).[3] A covered "public safety officer," in turn, is defined, in relevant part, as "an individual serving a public agency *in an official capacity*, with or without compensation as a firefighter . . . ."[4] Thus, in order to qualify as a covered firefighter under the PSOB Act, claimant must show that the decedent was a

---

3. BJA is authorized to interpret and administer this statutory benefit program. 42 U.S.C. § 3796c(a). (footnote in original).

4. 42 U.S.C. § 3796b(8) (emphasis added). " 'Firefighter' includes an individual serving as

an officially recognized or designated member of a legally organized volunteer fire department . . . ." 42 U.S.C. § 3796b(4); 28 C.F.R. § 32.2(n). (footnote in original).

public safety officer serving the USFS in an official capacity.

* * *

6. The following facts, in combination, are all-but dispositive of claimant's failure to show that the decedent was serving the federal government in an official capacity as a functional part of the USFS: (a) the decedent was hired and paid by H & P, which had, under its Agreement with the USFS, a clearly superior right of control as his employer, pursuant to which right the company could remove Mr. LaBare from his assignment to the USFS at any time and could direct the performance of his duties other than when he was flying on a USFS mission; (b) all compensation and benefits provided to the decedent, or his survivors, were made available through H & P; (c) the Agreement expressly assigned H & P third-party liability with respect to any damage to property or persons occurring as a result of any H & P employee's fault or negligence; (d) the USFS assumed no responsibility or liability with respect to any of decedent's actions resulting in damage, or otherwise due to his fault or negligence; and (e) pursuant to ¶ I.32 of the Agreement, H & P was obligated to procure insurance to address the possible occurrence of such property or personal damage.

(alterations in original; selected footnotes omitted). In reaching its final agency decision to deny plaintiff PSOBA benefits, the Director of the BJA relied heavily on and cited to an unpublished Ninth Circuit opinion in *Holstine v. Department of Justice*, 688 F.2d 846 (9th Cir.1982) (table).[5]

On August 19, 2005, Ms. LaBare filed a complaint in this court, seeking review of the BJA Director's denial of benefits under the PSOBA.[6] In her complaint, plaintiff states that the BJA also improperly denied her benefits because Craig LaBare was officially recognized as "a functional part of the Forest Service, under its direction and supervision." Plaintiff claims that "[t]he BJA determination that Craig LaBare was not in the official service of the Forest Service is erroneous, unreasonable, arbitrary, an abuse of discretion and not supported by the administrative record in this case."

In response to the plaintiff's complaint, defendant filed a motion for judgment upon the administrative record. In its motion, defendant argues that the BJA "reasonably determined that [pursuant to the statute] Mr. LaBare was not a 'public safety officer'" within the meaning of the PSOBA. *See* 42 U.S.C. § 3796b(9)(A). Further, the defendant states that Congress did not intend for the PSOBA to cover privately employed individuals.

**DISCUSSION**

Laurie LaBare appeals the denial by the BJA of death benefits as a result of her husband, Craig LaBare's untimely death. This court has jurisdiction to review final decisions of the BJA pursuant to 28 U.S.C. § 1491 (2000). *See United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Yanco v. United States,* 258 F.3d 1356, 1358–59 (Fed.Cir.2001), cert. *denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 885 (2002). Plaintiff has standing to bring an action on behalf of the deceased as the sur-

5. In *Holstine,* the LEAA (a predecessor to the BJA) determined that the pilot's widow was not entitled to PSOBA benefits because the pilot was not considered a public safety officer due to his having been hired and paid wages by a private employer, and that there was no evidence Congress intended to compensate privately employed persons engaged in firefighting in the PSOBA. *Holstine v. Dep't of Justice,* slip op. at 2 (9th Cir. Aug.4, 1982), 688 F.2d 846 (table). The facts in the case currently before the court are very similar to the facts in *Holstine.*

6. The plaintiff has asserted in her complaint that the ruling on this case may determine whether other putative class members have rights that are addressed in this matter through class action claims. However, this case has not been certified as a class action and no motion to certify was filed in the case. The decision in this matter applies to the case-specific facts relevant to the unfortunate death of Mr. LaBare.

viving spouse at the time of his death pursuant to 42 U.S.C. § 3796(a)(1).

Judicial review of final BJA decisions is limited to the following inquiries:

(1) whether there has been substantial compliance with statutory requirements and with the requirements of implementing regulations;

(2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and

(3) whether the decision denying the claim is supported by substantial evidence.

*Yanco v. United States,* 258 F.3d at 1362 (citing *Chacon v. United States,* 48 F.3d 508, 511 (Fed.Cir.1995)); *see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Greeley v. United States,* 50 F.3d 1009, 1010 (Fed.Cir.1995) (quoting *Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102, *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981)).

"Substantial evidence" has been defined by the United States Supreme Court as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) (quoting *Consol. Edison Co. of N.Y. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Jacobs v. Dep't of Justice,* 35 F.3d 1543, 1546 (Fed.Cir.1994). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n,* 383 U.S. at 620, 86 S.Ct. 1018. As long as the BJA's decision is reasonably supported by relevant evidence, this court should affirm the agency decision.

According to 28 C.F.R. § 32.21:

(a) A claimant for any benefit or fee under the Act and this part shall submit such evidence of eligibility or other material facts as is specified by this part. The Bureau may require at any time additional evidence to be submitted with regard to entitlement, the right to receive payment, the amount to be paid, or any other material issue.

(b) Whenever a claimant for any benefit or fee under the Act and this part has submitted no evidence or insufficient evidence of any material issue or fact, the Bureau shall inform the claimant to submit such evidence within a reasonably specified time. The claimant's failure to submit evidence on a material issue or fact as requested by the Bureau shall be a basis for determining that the claimant fails to satisfy the conditions required to award a benefit or fee or any part thereof.

The starting point for the analysis is the PSOBA, which states:

In any case in which the Bureau of Justice Assistance (hereinafter in this subchapter referred to as the "Bureau") determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit of $250,000, adjusted in accordance with subsection (h) of this section. . . . [7]

42 U.S.C. § 3796(a) (2000 & Supp. II 2002); *see also* 28 C.F.R. § 32.1. The PSOBA defines "public safety officer" as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, as a firefighter, as a chaplain, or as a member of a rescue squad or ambulance crew." 42 U.S.C. § 3796b(8)(A).

■ The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d

---

7. Section 3796(h) provides that: "On October 1 of each fiscal year beginning after June 1, 1988, the Bureau shall adjust the level of the benefit payable immediately before such October 1 under subsection (a) of this section, to reflect the annual percentage change in the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics, occurring in the 1–year period ending on June 1 immediately preceding such October 1." 42 U.S.C. § 3796(h).

808 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251, (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of coexistence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941. Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23

F.3d 388, 391 (Fed.Cir.) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)), *reh'g denied, en banc suggestion declined* (1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States,* 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."), *reh'g denied,* sub nom. *Hall v. United States,* 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005); *Chamberlain Group, Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1196 (Fed.Cir.2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972))), cert. *denied,* 544 U.S. 923, 125 S.Ct. 1669, 161 L.Ed.2d 481 (2005).

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency

to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (footnote omitted), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 29, 82 L.Ed.2d 921 (1984). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoted in *Yanco v. United States*, 258 F.3d at 1362). The United States Court of Appeals for the Federal Circuit has found that "Congress has expressly delegated to BJA the task of promulgating regulations to implement the [Public Safety Officers' Death] Benefits Act." *Yanco v. United States*, 258 F.3d at 1362 (citing 42 U.S.C. § 3796c(a)). The regulations at issue in the case currently before the court are set forth in 28 C.F.R. §§ 32.2(c), (j) and (n) and were promulgated in exercise of that authority. *See* 28 C.F.R. § 32.1. "BJA's implementing regulations thus qualify for *Chevron* deference." *Yanco v. United States*, 258 F.3d at 1362.

■ *Chevron* deference requires that a court ask two questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778. If congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous

with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted).

■ With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan*, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

■ In order to determine whether plaintiff can recover for the death of her husband Craig LaBare, the first question is whether Mr. LaBare was a "public safety officer," "serving a public agency in an official capacity." *See* 42 U.S.C. § 3796b(8)(A). In the PSOBA, Congress did not further define what it means to be "serving a public agency in an official capacity." [8] The BJA was given

---

8. The following colloquy occurred in the Congress prior to the passage of the PSOBA:

Rep. Gary A. Myers (PA): "Could the gentleman tell me, is there any way in which this bill

the authority to issue to such rules, regulations, and procedural guidance as may be necessary to carry out the purposes of the PSOBA. *See* 42 U.S.C. § 3796(c)(a). Those regulations were included in 28 C.F.R. §§ 32.1–32.25 (2003), but did not offer much clarification.

The BJA issued a legal interpretation to further clarify, as follows:

> In order to be serving a public agency in an official capacity one must be an officer, employee, volunteer, or similar relationship of performing services as a part of a public agency. To have such a relationship with a public agency, an individual must be officially recognized or designated as functionally within or a part of the public agency.[9]

Office of Judicial Assistance, Research, and Statistics, U.S. Dep't of Justice, *Legal Interpretations of the Public Safety Officers' Benefits Act* 9 (1981) (summarizing *Holstine v. Law Enforcement Assistance Admin.*, PSOB No. 78–338 (B.J.A. July 8, 1980), aff'd *without op.*, No. 80–7477, 688 F.2d 846 (9th Cir. Aug. 4, 1982)); *see also Chacon v. United States*, 48 F.3d 508, 512 (Fed.Cir.1995). In *Chacon*, the Court of Appeals for the Federal Circuit acknowledged and found reasonable the BJA's *Legal Interpretations* of "serving a public agency in an official capacity." *Id.*

There is no dispute in the case before this court that when Craig LaBare died he was employed by Hawkins and Powers Aviation, Inc., a private contractor, which had the service contract with United States Forest Service. Moreover, Mr. LaBare was not an officer, employee, volunteer, or performing services as part of the United States Forest Service, or any government entity. According to the plaintiff, however, Mr. LaBare was officially recognized or designated as "a functional part of the Forest Service, under its

direction and supervision to slow the spread of wildfires and to save lives and property." The defendant disagrees and argues in favor of upholding the BJA's denial of death benefits.

Even though this court does not have tort jurisdiction, the defendant argues that cases applying definitions from the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2690, are helpful in the discussion regarding Mr. LaBare, citing, for example, *Letnes v. United States*, 820 F.2d 1517, 1518–19 (9th Cir.1987). *Letnes* involved a co-pilot employee of a private employer who contracted with the Forest Service to deliver fire retardant. The Ninth Circuit did not allow the claimant, who had been denied coverage, to recover under the FTCA. The Ninth Circuit in *Letnes* observed:

> Most of the contractual provisions referred to by the district court as indicia of employee status are "the sort of regulation-mandated contractual restrictions ... that are designed to secure federal objectives and that, despite their restrictive effect on the activities of the contracting party, do not convert an independent entrepreneur into an 'agent' of the federal government." The district court noted that the contract included maximum operating periods between maintenance, weighing and balancing requirements, engine overhaul procedures, and extensive and detailed equipment provisions including requirements for flashlight batteries, bandages, and exterior markings on the plane. All of these provisions are prescribed by the Federal Aviation Administration. These provisions are designed to secure minimum safety, not to control the detailed physical operation of the plane. Other contract provisions requiring pilot certifications, maximum work hours, and

---

would apply to privately employed safety or security officers?"

Rep. Joshua Eilberg (PA): "No, it would not."

Rep. Myers: "What if they were called by a local arm of the government or the local police organization to assist in any way?"

Rep. Eilberg: "It is my opinion that they would not be included."

122 Cong. Rec. 12,009 (1976).

9. *See* 42 U.S.C § 3796b(7) (" '[P]ublic agency' means the United States, any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands of the United States, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States, or any unit of local government, department, agency, or instrumentality of any of the foregoing[.]'").

inspections are similarly designed to satisfy the government's safety objectives.

*Letnes v. United States,* 820 F.2d at 1519 (citations omitted). According to the defendant, the FTCA waiver of sovereign immunity does not extend to independent contractors and does not convert such contractors into employees, nor should Mr. LaBare, a private contract employee, be covered under the PSOBA. *See also Leone v. United States,* 910 F.2d 46, 49 (2d Cir.1990), *cert. denied,* 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991).

In support of plaintiff's claim that her husband Craig LaBare was officially recognized or designated a functional part of the Forest Service, the plaintiff points to a number of documents in the record, including the "Report of Public Safety Officer's Death," which was completed on Craig LaBare after the crash.[10] It is a United States Department of Justice form which is signed by a representative of the United States Forest Service. The entries on the form, however, state that the superior officer of the decedent Craig LaBare is Duane Powers, the owner of Hawkins and Powers, a private corporation. Plaintiff also offers an Airplane Pilot Qualification and Approval Record, which shows that Craig LaBare was approved to fly for the Forest Service. This document also states that Mr. LaBare was employed by Hawkins and Powers Aviation. The plaintiff further refers to documents which state that Craig LaBare was approved to fly and perform as a flight engineer, mechanic, and ground instructor by the Federal Aviation Administration. These forms, however, do not rise to the level of official recognition of Craig LaBare as an employee or functional part of a government entity, rather they represent qualification certificates required from all pilots. Finally, plaintiff points to the fact that Mr. LaBare was memorialized by the Forest Service post-mortem. Such recognition, although well deserved and appropriate, does not establish that at the time of the crash, Mr. LaBare was "serving a public agency in an official capacity."

Plaintiff also asserts that Mr. LaBare was officially recognized and had a functional relationship with the Forest Service, because Mr. LaBare's flights were authorized and controlled by the Forest Service and other government agencies. Although delivery of air-tanker, firefighting services provided by contractors, such as Hawkins and Powers Aviation, may be directed and monitored by the Forest Service, this does not lead to the conclusion that the contractor's employees became employees of the government, or serve the government in an "official capacity." In *Leone,* the United States Court of Appeals for the Second Circuit held that aviation medical examiners, who examined a pilot after he had suffered a heart attack, resulting in a plane crash, were not government employees (i.e., were not acting on behalf of a federal agency in an official capacity). *Leone v. United States,* 910 F.2d at 51. In reaching this conclusion, the court cited section 220(2) of the Restatement (Second) of Agency. *Id.* at 49. The Restatement provides that:

> In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) the length of time for which the person is employed; (f) whether the employer or workman supplies the instrumentalities, tools and place of work for the person doing the work; (g) the method of payment....

Restatement (Second) of Agency § 220(2) (1958).

As with the medical examiners considered in *Leone,* the federal government did not exercise supervisory or personnel control over the professional services provided by

---

10. The Bureau gives substantial weight to the evidence and findings of fact presented by state,

local, and federal administrative and investigative agencies. *See* 28 C.F.R. § 32.5 (2005).

private contract pilots, such as Mr. LaBare. Moreover, the *Leone* court wrote: "Also instructive [here] is the fact the [USFS] provides no insurance and does not pay workers' compensation or social security taxes" for contract pilots. *Leone v. United States,* 910 F.2d at 50. Even if the timing and geographic location of Mr. LaBare's flight was operationally directed by the Forest Service, his employment, pay, ultimate control, and liability coverage were the responsibility of Hawkins and Powers, Inc., a private corporation.

The burden of proof is on the claimant to demonstrate that Mr. LaBare was a public safety officer serving in an official capacity. According to 28 C.F.R. § 32.21(b): "Whenever a claimant for any benefit . . . under the [PSOB] Act and this [regulation] has submitted . . . insufficient evidence of any material issue or fact, [BJA] shall inform claimant what evidence is necessary for a determination as to such issue or fact and shall request the claimant to submit such evidence within a reasonably specified time. The claimant's failure to submit evidence on a material issue or fact as requested by [BJA] shall be a basis for determining that the claimant fails to satisfy the conditions required to award a benefit. . . ." The record does not reflect that Mr. LaBare was ever officially recognized at any time as a government employee or acknowledged as "functionally" a part of the Forest Service.

Finally, the plaintiff argues that the denial of benefits to Ms. LaBare is arbitrary and capricious because the defendant provided benefits to privately employed emergency workers, including contract ambulance workers, as a result of the September 11, 2001 terrorist attacks. Although Mr. LaBare's death is no less tragic, pursuant to sections 611 and 612 of the USA Patriot Act of 2001, Pub.L. No. 107–56, 115 Stat. 272 (§ 611 is codified at 42 U.S.C. § 3796c–1), the BJA did pay death benefits to individuals who perished as a result of the September 11, 2001 attacks, some of whom were privately employed emergency workers.

The definition of "public safety officer" and "in an official capacity" are the same in the PSOBA and in the USA Patriot Act. *See* 42 U.S.C. § 3796c–1 (USA Patriot Act); 42 U.S.C. § 3796b(9)(A) (PSOBA); *Chacon v. United States,* 48 F.3d at 512. Although the defendant does not dispute that the September 11, 2001 payments were made by BJA to privately employed emergency workers, the defendant argues that the payments to those contract ambulance workers were made pursuant to language authorizing payment to victims of the September 11 terrorist attack in specific statutory sections of the USA Patriot Act as follows:

Sec. 611. 1. 42 U.S.C. 3796c–1. EXPEDITED PAYMENT FOR PUBLIC SAFETY OFFICERS INVOLVED IN THE PREVENTION, INVESTIGATION, RESCUE, OR RECOVERY EFFORTS RELATED TO A TERRORIST ATTACK.

(a) In General.—Notwithstanding the limitations of subsection (b) of section 1201 or the provisions of subsections (c), (d), and (e) of such section or section 1202 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796, 3796a), upon certification (containing identification of all eligible payees of benefits pursuant to section 1201 of such Act) by a public agency that a public safety officer employed by such agency was killed or suffered a catastrophic injury producing permanent and total disability as a direct and proximate result of a personal injury sustained in the line of duty as described in section 1201 of such Act in connection with prevention, investigation, rescue, or recovery efforts related to a terrorist attack, the Director of the Bureau of Justice Assistance shall authorize payment to qualified beneficiaries, said payment to be made not later than 30 days after receipt of such certification, benefits described under subpart 1 of part L of such Act (42 U.S.C. 3796 et seq.).

(b) Definitions.—For purposes of this section, the terms "catastrophic injury," "public agency," and "public safety officer" have the same meanings given such terms in section 1204 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796b).

Section 612. TECHNICAL CORRECTION WITH RESPECT TO EXPEDIT-

ED PAYMENTS FOR HEROIC PUBLIC SAFETY OFFICERS.

Section 1 of Public Law 107–37 (an Act to provide for the expedited payment of certain benefits for a public safety officer who was killed or suffered a catastrophic injury as a direct and proximate result of a personal injury sustained in the line of duty in connection with the terrorist attacks of September 11, 2001). . . .

\* \* \*

Section 613. PUBLIC SAFETY OFFICERS BENEFIT PROGRAM PAYMENT INCREASE.

(a) Payments.—Section 1201(a) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796) is amended by striking "$100,000" and inserting "$250,000."

(b) 42 U.S.C. 3796 note-Applicability.— The amendment made by subsection (a) shall apply to any death or disability occurring on or after January 1, 2001.

USA Patriot Act of 2001, §§ 611–13, Pub.L. No. 107–56, 115 Stat. 272, 369 (§ 611 codified at 42 U.S.C. § 3796c–1).

The defendant argues that the benefits awarded to victims of terrorist attacks pursuant to the USA Patriot Act are not equivalent to the benefits available pursuant to the PSOBA. The defendant explains that the USA Patriot Act legislation was intended as an expedited, almost "automatic" payment, to September 11, 2001 victims, and that the Act greatly limited the discretion of the BJA by requiring payment to qualified beneficiaries, not later than 30 days after receipt of certification by a public agency that a public safety officer died in the line of duty in connection with the terrorist attacks of September 11, 2001. See 42 U.S.C. § 3796c–1. Thus the normal BJA review procedures were superseded in the September 11 terrorist cases.

Plaintiff's argument analogizing to death benefit compensation paid to private ambulance or other contract workers who died in the September 11, 2001 terrorist attacks raises procedural and legal inconsistencies between administration of death benefits for individuals such as Mr. LaBare and traditional PSOBA benefits claims, as opposed to victims of terrorism. As in plaintiff's case, the BJA was tasked with administering the September 11 terrorist death benefits claims. It also is correct that the limited provisions in the USA Patriot Act which address benefits for fallen victims engaged in "prevention, investigation, rescue or recovery efforts related to a terrorist attack," 42 U.S.C. § 3796c–1, do not address or amend the PSOBA definitions of either "public safety officer" (section 3796b(8)(A), now section 3796b(9)(A)), or "in an official capacity," see Chacon v. United States, 48 F.3d at 512. Moreover, section 611 of the USA Patriot Act was codified into the PSOBA as 42 U.S.C. § 3796c–1 and did not redefine the existing PSOBA definitions of "public safety officer." The other two relevant USA Patriot Act enactments, sections 612 and 613, remain uncodified.

The major distinction between Mr. LaBare and the contract ambulance drivers referred to by the plaintiff who received September 11 benefits is that Mr. LaBare, while dying a tragic death, did not die in efforts related to a terrorist attack and his claim was not processed by the BJA in accordance with section 3796c–1, which, although codified in the PSOBA, had its origins in the USA Patriot Act. In the case of Mr. LaBare, the BJA followed traditional interpretations of PSOBA eligibility, consistent with the BJA's prior interpretations, to exclude private contract employees from death benefit coverage. There is no indication that the BJA intended to diminish the memory or sacrifice of firefighters like Mr. LaBare, or the tragedy associated with a contract firefighter's death. Rather, the BJA continued to hold consistent with past practice that the hiring contractor, not the federal government, is responsible for the conditions and benefits related to the employment of its employees, including pay, insurance, and supplying and maintaining the aircraft in which Mr. LaBare carried out his firefighting mission.

The BJA's final agency decision reasonably concluded that:

Unfortunately for the claimant here, I have before me no certification from the USFS attesting that Mr. LaBare was a

"public safety officer employed by [it]," and even if I had, such a certification would not be statutorily entitled to treatment as *prima facie* evidence, because the (terrorism-related) circumstances that bring sections 611 and 612 to bear are not present; accordingly, I am not permitted to pay on the claim until Mrs. LaBare has provided sufficient evidence that the decedent was such a "public safety officer." This she has failed to do.

PSOBA Claim No.2003–37, Co–Pilot Craig LaBare, dated June 21, 2005.

As for the benefits BJA awarded with respect to claims brought by victims of September 11, 2001, the decisions were case specific to those terrorist act claims. The USA Patriot Act was the result of a catastrophic, national tragedy, which led to speedy, remediating legislation to deal with various aspects of the crisis, including the personal tragedies of so many. There is no indication in the USA Patriot Act legislation that Congress intended to radically change the traditional relationship between the government and its contractors, which would have implications beyond the PSOBA. The USA Patriot Act awards were made in a different climate, under extreme time pressure, under a different benefits scheme, pursuant to a different piece of authorizing legislation, and in reaction to a national crisis. Although the distinction is, no doubt, difficult for families to understand, the result in the September 11, 2001 cases of privately employed contract emergency workers does not alter the statutory eligibility requirements for claims pursuant to the definitions included in the PSOBA and the implementing regulations. The BJA director's final decision in plaintiff's case substantially complied with the statutory requirements and implementing regulations, was supported by substantial evidence and was not arbitrary, capricious, or contrary to the law.

The recently issued case of *Christine Wells Groff and Michael Wells v. United States,* though coming to a different conclusion on PSOBA benefits, is in concurrence with this court's conclusion that USA Patriot Act benefit payments to private contractor employees does not assist the PSOBA claimant.

*See Christine Wells Groff and Michael Wells v. United States,* 72 Fed.Cl. 68, 80, 2006 WL 2079108 (2006) ("The court disagrees with plaintiffs' conclusion that the BJA has acted arbitrarily and capriciously in treating terrorism-related deaths differently from deaths unrelated to terrorism. Congress established a new and different process for reviewing applications for PSOBA benefits for the survivors of rescue workers who perish in terrorism-related disasters....").

In the Groff case, in spite of the court's above-quoted position on the USA Patriot Act, PSOBA benefits were awarded to the survivors of Lawrence Groff. Mr. Groff was employed by San Joaquin Helicopters, a private corporation and a contractor with the State of California Department of Forestry and Fire Protection. *Id.* at 2, 36. Mr. Groff was piloting an aerial firefighting tanker, owned by the State of California, in support of fire suppression, when his airtanker collided with another aircraft in mid-air. *Id.* at 2. In reviewing the PSOBA claim, the Groff court started at the same place this court did, with language of the PSOBA, which provides benefits to those "serving a public agency in an official capacity," 42 U.S.C. § 3796b(8)(A), but came to a different conclusion.

As discussed above, the BJA's legal interpretation of "serving a public agency in an official capacity" is:

> In order to be serving a public agency in an official capacity one must be an officer, employee, volunteer, or similar relationship of performing services as a part of a public agency. To have such a relationship with a public agency, an individual must be officially recognized or designated as functionally within or a part of the public agency.

Office of Judicial Assistance, Research, and Statistics, U.S. Dep't of Justice, *Legal Interpretations of the Public Safety Officers' Benefits Act* 9 (1981) (summarizing *Holstine v. Law Enforcement Assistance Admin.,* PSOB No. 78–338 (B.J.A. July 8, 1980), *aff'd without* op., No. 80–7477, 688 F.2d 846 (9th Cir. Aug. 4, 1982)); *see also Chacon v. United States,* 48 F.3d at 512; *Christine Wells Groff and Michael Wells v. United States,* 72 Fed.

Cl. at 71, 2006 WL 2079108. Since Mr. Groff was not a public employee, the court described the issue as whether Mr. Groff "was nonetheless performing services as a part of the CDF [California Department of Forestry and Fire Protection] much like a CDF employee and was officially recognized by the CDF as doing so." *Id.* at 74. The *Groff* court offered a characterization of the BJA's above-quoted language, that the requisite official capacity for PSOBA benefits includes an employee, or, using new terminology, an individual in a "similar relationship" with the public agency and "officially recognized" by the agency. *See Legal Interpretations of the Public Safety Officers' Benefits Act* 9 (1981).

The *Groff* court rejected the portion of the BJA's 1981 *Legal Interpretations* which discussed the 1980 *Holstine* case as "naught but the BJA's unpublished interpretation, albeit a longstanding one...." *Christine Wells Groff and Michael Wells v. United States,* 72 Fed.Cl. at 75, 2006 WL 2079108; *see Holstine v. Dep't of Justice,* 688 F.2d 846 (survivors of deceased employee of a private contractor were not entitled to PSOBA benefits). The Groff court also rejected as dicta the trial court's language in *Chacon* that the "BJA could reasonably conclude that decedents were not in such a relationship with the [public] Land Department, based on its prior (also reasonable) holding that one who works for a government contractor does not thereby acquire the requisite relationship to the contracting agency." *Chacon v. United States,* 32 Fed.Cl. 684, 688 (citing the BJA's 1981 *Legal Interpretations)* (alteration added), *aff'd,* 48 F.3d 508 (Fed.Cir.1995); *see Christine Wells Groff and Michael Wells v. United States,* 72 Fed.Cl. at 75, 76 n. 11, 2006 WL 2079108. Furthermore, the *Groff* court also rejected that portion of the legislative history, quoted earlier in this opinion, in which there was a brief discussion of and conclusion that the PSOBA would not provide benefits to survivors of private contractor employees, as a mere "debate fragment." *Christine Wells Groff and Michael Wells v. United States,* 72 Fed.Cl. at 78, 2006 WL 2079108; *see* 122 Cong. Rec. 12002, 12009 (1976). At the same time, the Groff court

offered selections from the legislative history as to the PSOBA's broad scope. *Id.* at 76–77.

Instead, the *Groff* court cites to other portions of the legislative history which address "public safety officers" and "policemen" and "firemen," but which is silent on the matter of contractor employees. *Id.* at 76–77. The *Groff* court endorsed "an expansive and generous impulse, not a cramped and miserly one," and notes that "remedial legislation should be construed liberally in order to effectuate its purpose." *Id.* at 79 (quoting, among other cases, *Lykes Bros. S.S. Co. v. United States,* 206 Ct.Cl. 354, 513 F.2d 1342, 1353 (1975) (concerning investment tax credit provisions)).

The *Groff* court also noted that subsequent amendments since 1976 to the PSOBA have not narrowed its scope, but broadened coverage for public safety officers, to include, for example, members of rescue squads, Federal Emergency Management Agency employees, civil defense officials, and also to cover death, for example, by heart attack while on duty or shortly thereafter. *Christine Wells Groff and Michael Wells v. United States,* 72 Fed. Cl. at 79, 2006 WL 2079108. These amendments, however, do not indicate that the employees of private contractors should be considered public safety officers for purposes of the PSOBA. This court is reluctant to read even remedial legislation, which provides benefits to public safety officers "serving a public agency in an official capacity," 42 U.S.C. § 3796b(8)(A), in such a way as to include the employees of private contractors in the statutory terms "public" and "official," without some signal from the legislative branch.

In any event, the *Groff* case is distinguishable from the present case on the facts. Although there are limited indicia of a nexus between the United States Forest Service and Mr. LaBare, such as government approval of Mr. LaBare to fly, and some direction on the location and timing of firefighting flights, the pervasive relationship between the State and Mr. Groff is absent from the present case. Mr. Groff used a State firefighting handbook, was told by the State what uniform to wear, was flying a

State-owned aircraft, used a State credit card for refueling, was supervised by a State employee, participated in State debriefings of missions, and was evaluated by State personnel. *Id.* at 83. Furthermore, the State Deputy Chief of Aircraft Maintenance and Engineering wrote letters after Mr. Groff's death for line-of-duty and PSOBA purposes, stating that Mr. Groff's hiring was approved by the State, he wore a State-supplied flight suit and helmet, was trained by the State, slept at State bases, ate State meals, was "serving as an officially recognized and designated member of the California Department of Forestry and Fire Protection," and the only function of the private contractor employer, San Joaquin Helicopters, was as a "pay conduit," with even his pay negotiated jointly by the private contractor employer, the State, and Mr. Groff. *Id.* at 83–85 & 85 n. 16. The State actually submitted the application for PSOBA benefits for Mr. Groff's survivors.[11] This fact-finding by the State agency (as opposed to the legal conclusions) was accorded substantial weight by the *Groff* court. *Id.* at 84. Therefore, regardless of the Groff court's interpretation of the PSOBA, the *Groff* case and the present case are distinguishable on the facts.

## CONCLUSION

For the foregoing reasons, although Mr. LaBare suffered a tragic, untimely death, the court finds that pursuant to the PSOBA and its implementing regulations, Craig LaBare was not a "public safety officer," "serving a public agency in an official capacity," as required for benefits under the statute and regulations. The BJA's decision was supported by substantial evidence and was not arbitrary, capricious, or contrary to the law. Defendant's motion for judgment upon the administrative record is **GRANTED,** and the plaintiff's cross-motion is **DENIED.** The plaintiff's complaint is **DISMISSED,** with prejudice. The clerk's office is directed to enter **JUDGMENT** in accordance with this decision. No costs.

**IT IS SO ORDERED.**

---

11. The *Groff* opinion notes that California law now requires that contracts between the State and private contractors for firefighting services include a provision which guarantees that the private contractor will provide survivors with a benefit in the same amount as the PSOBA benefit, if the BJA finds a contractor employee ineligible for PSOBA benefits. *Christine Wells Groff and Michael Wells v. United States,* 72 Fed.Cl. at 88 n. 17, 2006 WL 2079108; *see* Cal. Pub. Res. Code § 4114.5(a)(1)-(2) (2002). The Groff court notes that the California legislation was not retroactive to benefit Mr. Groff's survivors. *Id.*